UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

FRANK A. DEMEO,                      :

                  Plaintiff,    :    11 Civ. 7099 (HBP)

     -against-                  :    OPINION
                                     AND ORDER
CARL J. KOENIGSMANN, MD, et al.,  :

                  Defendants.   :

----------------------------------X

          PITMAN, United States Magistrate Judge:


I.   Introduction


          Frank A. DeMeo, an inmate in the custody of the New
York State Department of Corrections and Community Supervision
("DOCCS"), proceeding pro se, commenced this action against Drs.
Carl J. Koenigsmann, Timothy Whalen, Mervat Makram, Jonathan
Holder and Frank Lancellotti pursuant to 42 U.S.C. § 1983,
alleging that the defendants were deliberately indifferent to
injuries to his right biceps muscle and shoulder that were
sustained during his incarceration at Woodbourne Correctional
Facility ("Woodbourne").  Specifically, plaintiff alleges that
defendants failed to provide him with "timely and adequate
medical care" in violation of the Eighth Amendment (First Amended
Complaint, dated May 15, 2012, (Docket Item 45) ("Am. Compl.")

¶ 1).  Plaintiff also brings state law claims of medical malpractice and negligence against the defendants (Am. Compl. ¶¶ 1, 84-87).  Plaintiff seeks damages, as well as declaratory and injunctive relief (Am. Compl. at 20).  By notice of motion dated June 2, 2014 (Docket Item 62), defendants move to dismiss plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

The parties have consented to my exercising plenary jurisdiction over this matter pursuant to 28 U.S.C. § 636(c) (Docket Item 38).  For the reasons set forth below, defendants' motion to dismiss is granted in part and denied in part.

II.   Facts[1]

A.   The Injury

On Wednesday, October 13, 2010, while incarcerated at Woodbourne and working as a "gym porter," plaintiff was storing dumbbell weights and allegedly ruptured his right biceps muscle and tore his right rotator cuff (Am. Compl. ¶ 15; Pl.'s Opp., at

---

[1]The facts set forth herein are drawn from plaintiff's First Amended Complaint, [Plaintiff's Opposition] to Defendant's Motion to Dismiss Plaintiff's Complaint -- 42 U.S.C. § 1983, dated July 25, 2014 (Docket Item 59) ("Pl.'s Opp.") and the exhibits attached to both submissions.  I have also considered plaintiff's sur-reply (Letter of Frank A. DeMeo to the undersigned, dated August 12, 2014 (Docket Item 66)).  In general, "[c]ourts in this Circuit have made clear that a plaintiff may not shore up a deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss." Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria, 265 F.R.D. 106, 122-23 (S.D.N.Y. Jan. 26, 2010) (Leisure, D.J.) (collecting cases). However, "the policy reasons favoring liberal construction of pro se complaints permit a court to consider allegations of a pro se plaintiff in opposition papers on a motion where . . . those allegations are consistent with the complaint." Rodriguez v. McGinnis, 1 F. Supp. 2d 244, 246-47 (S.D.N.Y. 1998) (Rakoff, D.J.) (adopting Report and Recommendation) (collecting cases). Thus, "[a] district court deciding a motion to dismiss may consider factual allegations made by a pro se party in his papers opposing the motion." Walter v. Schult, 717 F.3d 119, 122 n.1 (2d Cir. 2013), citing Gill v. Mooney, 824 F.2d 192, 195 (2d Cir. 1987)(considering pro se plaintiff's affidavit in opposition to a motion to dismiss for failure to state a claim).  Accordingly, in resolving defendants' motion, I have considered the factual allegations made by plaintiff in his opposition papers that are consistent with the claims made in his amended complaint.

$4^2$; see also Ambulatory Health Record Progress Note, annexed as
Exhibit A to Am. Compl., at 1).  At the time, plaintiff heard a
"pop" but did not feel any pain (Am. Compl., Ex. A, at 1).

Plaintiff allegedly informed Corrections Officer
("C.O.") Bivens of his injury (Am. Compl., Ex. A, at 1; Pl.'s
Opp., at 4).  Plaintiff claims that, at the direction of Area
Sergeant Cohn, C.O. Bivens reported the injury to Nurse Baumgar-
ten at Woodbourne's hospital; Nurse Baumgarten reportedly told
C.O. Bivens not to send plaintiff to the hospital unless he was
bleeding or had a compound fracture and that plaintiff should
submit a sick-call request (Pl.'s Opp., at 4).  Plaintiff claims
that he submitted a "sick-call slip" that same day, but it was
not "received" until Thursday, October 14, 2010, and he was not
seen until Monday, October 18, 2010 (Pl.'s Opp., at 4).[3]

---

[2]Because plaintiff includes attachments with inconsistent
exhibit labels and pagination, I refer to the page numbers
assigned by the Court's ECF system for all citations to
plaintiff's opposition.

[3]Plaintiff has also submitted his January 3, 2011 letter to
Dr. Koenigsmann, the Deputy Commissioner and Chief Medical
Officer of the Division of Health Services, in which he claims
that after the incident on October 13, 2010, he reported the
injury to C.O. Bivens, who asked if he wanted to go to emergency
sick call (Pl.'s Opp., at 35).  Plaintiff claimed in this letter
that he declined to go to sick call because in the past Nurse
Baumgarten instructed him to seek assistance only if he was
bleeding or had a compound fracture (Pl.'s Opp., at 35).
Instead, he stated that he "waited a day or two to see how [he]
felt," experienced "discomfort" and significant loss in strength
(continued...)

B.   The Diagnosis

On October 18, 2011, plaintiff saw an unidentified nurse, Physician Assistant ("P.A.") Switz and Dr. Lancellotti at sick call (Am. Compl., at 5 & Ex. A, at 1).   The nurse noted that plaintiff denied that his pain was severe, complained of a bruise on his right biceps and, stated that, at the time he sustained the injury, "[i]t felt like something separated" (Am. Compl., Ex. A, at 1).   The nurse saw no "obvious deformity" but noted an ecchymosis[4] on plaintiff's right biceps that was approximately two inches in diameter (Am. Compl., Ex. A, at 1).

P.A. Switz concluded that plaintiff had a "possible proximal biceps rupture,"[5] ordered an MRI of plaintiff's right shoulder and directed plaintiff to wear a sling until the MRI results were available (Am. Compl., ¶ 17 & Ex. A, at 1).   P.A. Switz also submitted a request for an MRI of the right biceps for review by Dr. Lancellotti and final approval by Dr. Makram,

_____

[3](...continued)
in his arm and shoulder and finally went to sick call on October 18, 2010 (Pl.'s Opp., at 35).

[4]An ecchymosis is "a small hemorrhagic spot . . . in the skin or mucous membrane forming a nonelevated, rounded or irregular, blue or purplish patch."   Dorland's Illustrated Medical Dictionary, ("Dorland's") at 525 (27th ed. 1988).

[5]A rupture of the biceps muscle is a "forcible tearing or disruption of" the muscle tissue.   Dorland's at 1476.

noting that the MRI should be conducted "soon" (Am. Compl. ¶¶ 10, 18-21, 72; Request and Report of Consultation, dated November 10, 2010, annexed as Exhibit C to Am. Compl.).

During the October 18 consultation with the medical staff, plaintiff's upper right arm was x-rayed.  The x-ray revealed post-surgical[6] changes to the acromioclavicular joint[7] and humeral head[8] and degenerative glenoid humeral joint disease[9], but no acute bone injury (X-Ray Requisition and Report, dated October 18, 2010, annexed as Exhibit D to Am. Compl.).

Plaintiff alleges that, on an unidentified date after October 18, 2010, Dr. Makram[10] denied the initial request for the

---

[6]One of plaintiff's shoulders was surgically repaired in 2003 and the other was surgically repaired in 2005 (Letter of Frank DeMeo to Dr. Rubinovich, dated June 20, 2011, annexed as Exhibit R to Am. Compl.).  After dislocating his right shoulder and re-tearing his right rotator cuff, plaintiff's right shoulder was repaired again in 2007 (Am. Compl., Ex. R).

[7]The acromioclavicular joint is the shoulder joint at which the spine of the scapula and the clavicle meet.  Dorland's at 21.

[8]The humeral head is where the humerus bone, the upper bone of the arm, intersects with the scapula/shoulder.  Dorland's at 779.

[9]Degenerative joint disease, also known as osteoarthritis, is a form of arthritis that "causes pain, swelling, and reduced motion in" joints -- here, the shoulder joint.  U.S. National Library of Medicine, National Institutes of Health, Medline Plus Medical Encyclopedia, "Osteoarthritis," http://www.nlm.nih.gov/-medlineplus/osteoarthritis.html (last visited Feb. 10, 2015).

[10]Dr. Makram was the Facility Health Services Director at
(continued...)

MRI "based on purely financial considerations" and that an MRI was scheduled only after Dr. Lancellotti made a second request (Am. Compl. ¶ 21 & Ex. C; Pl.'s Opp., at 5).

On November 15, 2010, approximately four weeks after the injury, an MRI was conducted (Am. Compl. ¶ 22).  It disclosed "a full thickness retracted proximal biceps tendon rupture with a large amount of surrounding fluid," "no evidence [of] muscle atrophy" or fracture, "a full thickness re-tear of the supraspinatus tendon"[11] and "glenohumeral joint effusion"[12] (Albany Medical Center Final Report, dated November 22, 2010, annexed as Exhibit F to Am. Compl.).  Plaintiff received the results on December 2, 2010, and Dr. Lancellotti scheduled a consultation with Dr. Holder, an orthopedic surgeon, on December 9, 2010 (Am. Compl. ¶¶ 12, 24-25).

---

[10](...continued)
Woodbourne and was employed by DOCCS (Am. Compl. ¶ 10).  She was allegedly responsible for the final approval of elective procedures, distributed polices, procedures and guidelines for medical care and managed operations, reporting to Dr. Koenigsmann, the Chief Medical Officer (Am. Compl. ¶ 10).

[11]"The supraspinatus tendon attaches the supraspinatus muscle . . . from the shoulder blade[] to the head of the arm bone at the shoulder joint."  HealthHype.com, "Supraspinatus Tendon -- Tendinitis, Tendinosis and Tear," http://www.health-hype.com/supraspinatus-tendon-tendinitis-tendinosis-and-tear.html (last visited Feb. 10, 2015).

[12]Glenohumeral joint effusion is the presence of fluid in the shoulder joint.  Dorland's at 532.

Dr. Holder examined the plaintiff and reviewed his x-ray and MRI results; he noted that plaintiff had full range of motion with no restrictions in his right arm and no weakness upon abduction or flexion, although he did find a "biceps belly deformity" (Request and Report of Consultation, dated December 2, 2010, annexed as Exhibit H to Am. Compl.).  Dr. Holder diagnosed plaintiff with a chronic right biceps rupture but did not find a rotator cuff tear (Am. Compl., Ex. H).  He also determined that the biceps rupture was "not surgically amenable [to] repair" (Am. Compl., Ex. H).

Plaintiff alleges that Dr. Holder explained that he could not conduct surgery because plaintiff's biceps muscle tissue was so degenerated that the tissue would shred, causing "extensive irreversible damage and loss of function to plaintiff's arm and shoulder" (Am. Compl. ¶ 28).  Plaintiff claims that Dr. Holder told him to expect a loss of one-third of the strength in his arm and that surgery of biceps and rotator cuff tears must be conducted within two to three weeks of injury to be effective (Am. Compl. ¶¶ 29-30; Pl.'s Opp., at 6).  He also claims that Dr. Holder advised him to seek a second opinion (Am. Compl. ¶ 30).

C.   Plaintiff's Request for a
     Second Opinion and a Second MRI

On December 23, 2010, after reviewing Dr. Holder's report, Dr. Lancellotti allegedly informed plaintiff that a second opinion would not be provided and reiterated that surgery would be effective only if it was performed within two to three weeks of injury (Am. Compl. ¶ 31 & Ex. A, at 4).

On January 3, 2011,[13] plaintiff sent a letter to Dr. Koenigsmann requesting permission to seek a second opinion at his own expense (Am. Compl. ¶¶ 8, 33).  Plaintiff claims that he received no response and that on March 2, 2011 he sent a second letter to Dr. Koenigsmann (Am. Compl. ¶¶ 34, 36).

Rita Grinbergs, the Regional Health Services Adminis-trator, wrote to plaintiff on March 15, 2011,[14] stating that she had spoken with plaintiff's doctor at Woodbourne, who advised that the injury was not amenable to surgery (Letter of Rita Grinbergs to Frank DeMeo, dated March 15, 2011, annexed as

---

[13]In his opposition to the motion to dismiss, plaintiff claims he sent this letter on January 3, 2010 (Pl.'s Opp., at 6); plaintiff's alleged injury occurred in October 2010.  I believe that plaintiff is referring to a letter he sent on January 3, 2011 but that he erroneously dated January 3, 2010 (see Pl.'s Opp., at 35-36).

[14]Plaintiff refers to this letter by the date he claims that he received it, March 21, 2011, but his citation to Exhibit I of the Amended Complaint makes it clear that he is referencing the letter dated March 15, 2011 (see, e.g., Am. Compl. ¶ 38).

Exhibit I to Am. Compl.).  Grinbergs instructed plaintiff that he "must follow the procedure set forth in [Health Services Policy & Management ("HSPM")] 7.02 'Inmate Provider of Choice'"[15] to request a second opinion and stated that it appeared plaintiff had not yet submitted a proper request to Dr. Makram (Am. Compl., Ex. I).

On March 28, 2011, plaintiff wrote to Dr. Makram formally requesting a second opinion and expressing his belief that his biceps could be repaired surgically (Letter of Frank DeMeo to Dr. Mervat Makram, dated March 28, 2011, annexed as Exhibit J to Am. Compl.).  In response, Dr. Makram wrote, "This issue was discussed with you before[.]  No recommendation from orthopedist for surgery" (Am. Compl., Ex. J).  On March 31, 2011, plaintiff again wrote Dr. Makram to confirm that his request for a second opinion was denied (Am. Compl. ¶ 41).  On April 1, 2011, Dr. Makram responded that Woodbourne would follow Dr. Holder's recommendation against surgery[16] (Letter of Dr. Mervat Makram to

_____

[15]HSPM 7.02 describes the procedure for requesting a consultation by a specialist at the inmate's expense and requires the inmate to submit a written request to the Facility Health Services Director, who must seek the approval of the Deputy Commissioner and/or Chief Medical Officer prior to the consultation (HSPM 7.02 annexed to Pl.'s Opp., at 39).

[16]Dr. Makram wrote:

After review of your medical file on 12/09/10 when you
(continued...)

Frank DeMeo, dated April 1, 2011, annexed as Exhibit K to Am. Compl.).

On April 11, 2011, plaintiff filed a grievance with Woodbourne's Inmate Grievance Review Committee (the "IGRC") based on the delay in diagnosis and treatment of his injuries, the permanent loss of function with respect to his arm and shoulder and the denial of permission to seek a second opinion and outside treatment (Letter of Frank DeMeo to the IGRC, dated April 11, 2011, annexed as Exhibit L-A to Am. Compl.).  As a remedy, plaintiff sought permission to seek a second opinion based on a physical examination and outside treatment of his injuries (Am. Compl., Ex. L-A).  On April 12, 2011, in response to plaintiff's grievance, Dr. Makram explained plaintiff's treatment history and diagnosis to the IGRC and stated that plaintiff had not requested a second opinion (Am. Compl., Ex. L-A).

---

[16](...continued)
were seen by orthopedist[,] he diagnosed you [with a] "biceps rupture chronic"[;] he noted[,] "not surgically amenable at this time[.]"  There was no notation of any delay in your care as the cause of not operating at this time.  Please note that you injured the same shoulder back in 2007 [and it] was noted on the MRI of 11/15/10 [that you had a r]e-injury [and] re[-]tear of one of the muscles in your shoulder.  Woodbourne is following the orthopedist['s] (specialist) recommendation for no surgery at this time

(Am. Compl., Ex. K).

On April 19, 2011, the IGRC recommended that plain-
tiff's request for a second opinion be granted and found that the
request complied with all procedural requirements (IGRC Recommen-
dation, dated April 19, 2011, annexed as Exhibit L-B to Am.
Compl.).  On May 10, 2011, plaintiff received a letter from the
Inmate Grievance Program's Superintendent informing him that his
request for a second opinion had been forwarded to the Regional
Medical Director, Dr. Whalen (Letter of Inmate Grievance Program
Superintendent to Frank DeMeo, dated May 10, 2011, annexed as
Exhibit N to Am. Compl.).

In a letter to Woodbourne's Nurse Administrator, dated
May 16, 2011, plaintiff requested that she mail a copy of plain-
tiff's November 15, 2010 MRI results from Woodbourne to Dr.
Mitchell Rubinovich, an orthopedist from whom plaintiff planned
to seek a second opinion (Am. Compl. ¶ 51; Letter of Frank DeMeo
to Ms. J. Barrett, dated May 16, 2011, annexed as Exhibit P to
Am. Compl.).

Plaintiff alleges that on May 19, 2011 he was informed
at sick call that, notwithstanding the IGRC's recommendation,
Drs. Whalen and Koenigsmann denied his grievance and his request
for permission to seek a second opinion (Am. Compl. ¶ 48).  This
allegation appears to be incorrect because it is contradicted by
other allegations in the complaint.  The complaint goes on to

allege that on June 3, 2011, Grinbergs told plaintiff's wife that plaintiff's request for a second opinion had not been denied, and on June 20, 2011, plaintiff did in fact mail his MRI results to Dr. Rubinovich for a second opinion (Am. Compl. ¶¶ 50-51).  Dr. Rubinovich responded on July 21, 2011, confirming that plaintiff's biceps was torn but explaining that, because the MRI did not fully depict plaintiff's shoulder, he was unable to tell whether plaintiff had a rotator cuff tear (Letter of Dr. Rubinovich to Frank DeMeo, dated July 21, 2011, annexed as Exhibit S to Am. Compl.).  Dr. Rubinovich stated that in order to treat plaintiff he would need Dr. Holder's notes concerning plaintiff's 2007 shoulder surgery and a second MRI to better visualize the rotator cuff (Am. Compl., Ex. S).  Because he lacked sufficient information, Dr. Rubinovich did not recommend a course of treatment, other than a second MRI (Am. Compl., Ex. S).  Dr. Rubinovich emphasized it was plaintiff's responsibility to organize any diagnostic testing and treatment with Woodbourne (Am. Compl., Ex. S).

Plaintiff claims that on August 15, 2011, he discussed Dr. Rubinovich's letter with Dr. Lancellotti, who, in turn, sought permission from Dr. Whalen for plaintiff to be examined by Dr. Rubinovich (Am. Compl. ¶ 53).  In a letter to Dr. Whalen, dated August 22, 2011, plaintiff requested permission to undergo

a second MRI and a consultation with Dr. Rubinovich at his own
expense (Letter of Frank DeMeo to Dr. Whalen, dated August 22,
2011, annexed as Exhibit T to Am. Compl.).

          Despite the fact that plaintiff was in fact seeking a
second opinion, in May 2011, he also appealed to DOCCS' Central
Office Review Committee ("CORC") what he apparently believed to
be the decision of Drs. Whalen and Koenigsmann denying his
request for a second opinion (Appeal Statement WB-15114-11, dated
May 26, 2011, annexed as Exhibit Q to Am. Compl.).  On August 31,
2011, the CORC approved plaintiff's request and concluded that
there was insufficient "evidence to substantiate any malfeasance
by staff or that [plaintiff was] not receiving appropriate
medical care" (CORC Second Medical Opinion and Treatment deci-
sion, dated August 31, 2011, annexed as Exhibit U to Am. Compl.).
The CORC noted that although outside specialists may make treat-
ment recommendations, whether and how those recommendations are
implemented is determined by the Facility Health Services Direc-
tor, i.e., Dr. Makram (Am. Compl., Ex. U).

          In a letter dated September 2, 2011, Grinbergs, on
behalf of Dr. Whalen, informed plaintiff that he should see his
primary care provider, Dr. Lancellotti, to request a second MRI
and that he should continue to make any requests for medical
treatment through Woodbourne's sick-call procedures (Letter of

Rita Grinbergs to Frank DeMeo, dated September 2, 2011, annexed as Exhibit V to Am. Compl.).  Plaintiff alleges that on September 12, 2011 he was able to schedule an appointment with Dr. Lancellotti (Am. Compl. ¶ 57).  On October 20, 2011, plaintiff signed a contract agreeing that if a second MRI of his right shoulder was approved, he would attend all appointments (Contract for Specialty Care Appointment, dated October 20, 2011, annexed as Exhibit W to Am. Compl.).

Plaintiff's papers do not disclose the plaintiff's condition or treatment or any further events subsequent to October 20, 2011.

D.  Plaintiff's Claims and
    Defendants' Arguments

Plaintiff asserts claims against Drs. Koenigsmann, Whalen and Makram in their individual and official capacities and against Drs. Holder and Lancellotti in their individual capacities.  Plaintiff alleges that defendants (1) were deliberately indifferent to his right biceps and shoulder injuries by delaying diagnosis and treatment of his injuries and by denying his request to seek a second opinion and second MRI, (2) were negligent and (3) committed medical malpractice (Am. Compl. ¶ 1).  Plaintiff also alleges that Dr. Koenigsmann is liable under a

theory of <u>respondeat</u> <u>superior</u> (Am. Compl. ¶¶ 84-87).  Plaintiff seeks three million dollars in compensatory damages for physical and emotional injury, a declaratory judgment that defendants violated his Eighth Amendment rights and an injunction ordering defendants "to carry out without delay adequate medical care of [plaintiff's] injuries and to not impede in any manner [plaintiff's] physicians['] provision of adequate medical care" (Am. Compl., at 20).

Defendants argue that (1) Dr. Lancellotti should be dismissed from this action because he was not served; (2) plaintiff was not denied or given untimely medical treatment; (3) plaintiff's request for permission to seek a second opinion was granted without delay; (4) "defendants are entitled to qualified immunity since defendants' conduct does not rise to the level of a violation under the Eighth Amendment of the United States Constitution"; (5) <u>respondeat</u> <u>superior</u> and negligence claims are not cognizable under Section 1983 and (6) "medical malpractice does not apply here because there was no conscious disregard for plaintiff's medical care" (Memorandum of Law in Support of Defendants' Motion to Dismiss, dated June 2, 2014, (Docket Item 63) ("Defs.' Mem."), at 1-2).

## III.  Analysis

A.  Legal
Standards

1.  Standard Applicable to
Defendants' Motion to Dismiss
Pursuant to Rule 12(b)(6)

The standards applicable to a motion to dismiss pursuant to Rule 12(b)(6) are well settled and require only brief review.

> When deciding a motion to dismiss under Rule 12(b)(6), [the court] must accept as true all well-pleaded factual allegations of the complaint and draw all inferences in favor of the pleader.  See City of Los Angeles v. Preferred Communications, Inc., 476 U.S. 488, 493, 106 S. Ct. 2034, 90 L.Ed.2d 480 (1986); Mires v. DeKalb County, 433 U.S. 25, 27 n.2, 97 S. Ct. 2490, 53 L.Ed.2d 557 (1977) (referring to "well-pleaded allegations"); Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).  "'[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'"  Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (quoting Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991)).  The Court also may consider "matters of which judicial notice may be taken."  Leonard T. v. Israel Discount Bank of New York, 199 F.3d 99, 107 (2d Cir. 1999) (citing Allen v. WestPoint-Pepperill, Inc., 945 F.2d 40, 44 (2d Cir. 1991)).  In order to avoid dismissal, a plaintiff must do more than plead mere "[c]onclusory allegations or legal conclusions masquerading as factual conclusions."  Gebhardt v. Allspect, Inc., 96 F. Supp. 2d 331, 333 (S.D.N.Y. 2000) (quoting 2 James Wm. Moore, Moore's Federal Practice ¶ 12.34[a][b] (3d ed. 1997)).

Hoffenberg v. Bodell, 01 Civ. 9729 (LAP), 2002 WL 31163871 at *3
(S.D.N.Y. Sept. 30, 2002) (Preska, D.J.); see also In re Elevator
Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007); Johnson &
Johnson v. Guidant Corp., 525 F. Supp. 2d 336, 345-46 (S.D.N.Y.
2007) (Lynch, D.J.).

"[T]he tenet that a court must accept as true all of
the allegations contained in a complaint is inapplicable to legal
conclusions," however.  Ashcroft v. Iqbal, supra, 556 U.S. at
678; Johnson v. Priceline.com, Inc., 711 F.3d 271, 275 (2d Cir.
2013).  As a result, "a court considering a motion to dismiss can
choose to begin by identifying pleadings that, because they are
no more than conclusions, are not entitled to the assumption of
truth.  While legal conclusions can provide the framework of a
complaint, they must be supported by factual allegations."
Ashcroft v. Iqbal, supra, 556 U.S. at 679.

The Supreme Court has clarified the mode of inquiry to
be used in evaluating a motion to dismiss pursuant to Rule
12(b)(6), which uses as a starting point the principle that "[a]
pleading that states a claim for relief must contain . . . a
short and plain statement of the claim showing that the pleader
is entitled to relief."  Fed.R.Civ.P. 8(a).

> [I]n Bell Atl[antic] Corp. v. Twombly, 550 U.S. 544,
> 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007), the Court
> disavowed the well-known statement in Conley v. Gibson,

> 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L.Ed.2d 80 (1957)
> that "a complaint should not be dismissed for failure
> to state a claim unless it appears beyond doubt that
> the plaintiff can prove no set of facts in support of
> his claim which would entitle him to relief."  550 U.S.
> at 562.  Instead, to survive a motion to dismiss under
> Twombly, a plaintiff must allege "only enough facts to
> state a claim to relief that is plausible on its face."
> Id. at 570.

Talley v. Brentwood Union Free Sch. Dist., Civil Action No. 08-

790, 2009 WL 1797627 at *4 (E.D.N.Y. June 24, 2009).

> While a complaint attacked by a Rule 12(b)(6) motion to
> dismiss does not need detailed factual allegations, a
> plaintiff's obligation to provide the grounds of his
> entitlement to relief requires more than labels and
> conclusions, and a formulaic recitation of the elements
> of a cause of action will not do.  Factual allegations
> must be enough to raise a right to relief above the
> speculative level, on the assumption that all the
> allegations in the complaint are true (even if doubtful
> in fact).

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007) (cita-

tions, internal quotation marks and alterations omitted).

In evaluating a motion under Rule 12(b)(6), the court

must determine whether the plaintiff has alleged any facially

plausible claims.  Fahs Constr. Grp., Inc. v. Gray, 725 F.3d 289,

290 (2d Cir. 2013) (per curiam), cert. denied, 134 S. Ct. 831,

187 L.Ed.2d 687 (2013).  A claim is plausible when its factual

content "allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged.  The plausi-

bility standard is not akin to a 'probability requirement,' but

it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations omitted).  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Ashcroft v. Iqbal, supra, 556 U.S. at 678 (internal quotation marks and citation omitted).  Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to re-lief.'" Ashcroft v. Iqbal, supra, 556 U.S. at 679, quoting Fed.R.Civ.P. 8(a)(2).

Nevertheless, where, as here, a plaintiff proceeds pro se, the complaint must be liberally construed to raise the strongest claims the allegations suggest.  Sykes v. Bank of Am., 723 F.3d 399, 403 (2d Cir. 2013); Sims v. Blot, 534 F.3d 117, 133 (2d Cir. 2008); Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006); see also Haines v. Kerner, 404 U.S. 519, 520-21 (1972); Tracy v. Freshwater, 623 F.3d 90, 100-04 (2d Cir. 2010) (observing that the requirement of "special solicitude" includes liberal construction of papers, "relaxation of the limitations on the amendment of pleadings," leniency in enforcing procedural rules, and "deliberate, continuing efforts to ensure that a pro se

20

litigant understands what is required of him" (citations omitted)).

2.   Deliberate
Indifference

Under the Eighth and the Fourteenth Amendments, the states have a limited obligation to provide medical care to sentenced prisoners. Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 433-34 (2001); Estelle v. Gamble, 429 U.S. 97, 103-04 (1976). "'[D]eliberate indifference to [the] serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment.'" Washington v. City of N.Y., 10 Civ. 389 (LTS)(JLC), 2011 WL 566801 at *2 (S.D.N.Y. Feb. 15, 2011) (Swain, D.J.), quoting Estelle v. Gamble, supra, 429 U.S. at 104.

Not every claim of inadequate medical treatment by a prisoner rises to the level of a constitutional violation. Estelle v. Gamble, supra, 429 U.S. at 105. The failure to provide medical care to a prisoner will give rise to a constitutional violation only if two elements are established:

> The first requirement is objective:  "the alleged deprivation of adequate medical care must be 'sufficiently serious.'" Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (quoting Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994)). The second requirement is subjective:  the charged

> officials must be subjectively reckless in their denial
> of medical care.  <u>Id</u>. at 280.  This means "that the
> charged official [must] act or fail to act while <u>actu-
> ally</u> <u>aware</u> of a substantial risk that serious inmate
> harm will result."  <u>Id</u>. (emphasis added).   Officials
> need only be aware of the risk of harm, not intend
> harm.  <u>Id</u>.  And awareness may be proven "from the very
> fact that the risk was obvious."  <u>Farmer</u>, 511 U.S. at
> 842, 114 S. Ct. 1970.

<u>Spavone v. N.Y. State Dep't of Corr. Servs.</u>, 719 F.3d 127, 138

(2d Cir. 2013); <u>accord</u> <u>Johnson v. Wright</u>, 412 F.3d 398, 403 (2d

Cir. 2005).  A plaintiff must establish both the objective and

subjective prongs of the deliberate indifference standard in

order to prevail.  <u>See</u> <u>Hill v. Curcione</u>, 657 F.3d 116, 122 (2d

Cir. 2011).

A medical need is sufficiently serious if it is "a

condition of urgency, one that may produce death, degeneration,

or extreme pain."  <u>Johnson v. Wright</u>, <u>supra</u>, 412 F.3d at 403

(internal quotation marks omitted).  "Factors to consider in

determining the existence of a serious medical condition include

'the existence of an injury that a reasonable doctor or patient

would find important and worthy of comment or treatment; the

presence of a medical condition that significantly affects an

individual's daily activities; the existence of chronic and

substantial pain,' or 'the absence of adverse medical effects or

demonstrable physical injury.'"  <u>Edmonds v. Cent. N.Y. Psychiat-

ric Ctr.</u>, 10 Civ. 5810 (DAB)(KNF), 2011 WL 3809913 at *4

(S.D.N.Y. Aug. 25, 2011) (Batts, D.J.) (adopting Report & Recommendation) (internal footnote, citation and alterations omitted), quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) and Smith v. Carpenter, 316 F.3d 178, 187 (2d Cir. 2003).  "The inquiry [with respect to the objective element of a deliberate indifference claim] is 'fact-specific' and 'must be tailored to the specific circumstances of each case.'"  Thomas v. Westchester Cnty., 12 Civ. 6718 (CS), 2013 WL 3357171 at *4 (S.D.N.Y. July 3, 2013) (Seibel, D.J.), quoting Smith v. Carpenter, supra, 316 F.3d at 185; see also Hudson v. McMillian, 503 U.S. 1, 8 (1992) ("[t]he objective component of [a deliberate indifference] claim is . . . [necessarily] contextual" and fact-specific).

Where the claim is that medical diagnosis and/or treatment has been improperly delayed, the inquiry with respect to the objective element focuses on the sequelae of the delay rather than the underlying condition itself.

> [W]here, as here, a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003) (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)) (emphases in original).

23

Bilal v. White, 494 F. App'x 143, 145 (2d Cir. 2012) (summary order) (first alteration in original).  "Stated differently, 'it's the particular risk of harm faced by the prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for [Section 1983] purposes.'"  Goris v. Breslin, 402 F. App'x 582, 585 (2d Cir. 2010) (summary order), quoting Smith v. Carpenter, supra, 316 F.3d at 186.

        The subjective prong of a Section 1983 claim for inadequate medical care requires the plaintiff to prove that "the charged official [acted] with a sufficiently culpable state of mind."  Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).  A plaintiff must show that "the prison official was aware of, and consciously disregarded, the prisoner's medical condition."  Hernandez v. Goord, 02 Civ. 1704 (DAB), 2006 WL 2109432 at *6 (S.D.N.Y. July 28, 2006) (Batts, D.J.), citing Chance v. Armstrong, supra, 143 F.3d at 703.  "'Deliberate indifference is a mental state equivalent to subjective recklessness . . . . This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result.'"  Nielsen v. Rabin, 746 F.3d 58, 63 (2d Cir. 2014) (first alteration in original), quoting Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006); Hemmings v. Gorczyk, 134

24

F.3d 104, 108 (2d Cir. 1998) (<u>per</u> <u>curiam</u>) (The standard is
"equivalent to criminal recklessness, [where] the official knows
of and disregards an excessive risk to inmate health or safety."
(quotation marks omitted), <u>quoting</u> <u>Hathaway v. Coughlin</u>, <u>supra</u>,
99 F.3d at 553).  "The reckless official need not desire to cause
such harm or be aware that such harm will surely or almost
certainly result.  Rather, proof of awareness of a substantial
risk of the harm suffices." <u>Salahuddin v. Goord</u>, <u>supra</u>, 467 F.3d
at 280.

A constitutional violation requires "more than ordinary
lack of due care for the prisoner's interests or safety."
<u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986).  A Section 1983
claim does not lie for conduct that is merely negligent.  <u>County
of Sacramento v. Lewis</u>, 523 U.S. 833, 849 (1998) ("[L]iability
for negligently inflicted harm is categorically beneath the
threshold of constitutional due process."), <u>citing</u> <u>Daniels v.
Williams</u>, 474 U.S. 327, 328 (1986); <u>accord</u> <u>Matican v. City of
N.Y.</u>, 524 F.3d 151, 158 (2d Cir. 2008); <u>Hendricks v. Coughlin</u>,
942 F.2d 109, 113 (2d Cir. 1991); <u>Hudak v. Miller</u>, 28 F. Supp. 2d
827, 831 (S.D.N.Y. 1998) (Sotomayor, then D.J.).  "[A] complaint
that a physician has been negligent in diagnosing or treating a
medical condition does not state a valid claim of medical mis-
treatment under the [Constitution]." <u>Estelle v. Gamble</u>, <u>supra</u>,

25

429 U.S. at 106; <u>accord</u> <u>Hill v. Curcione</u>, <u>supra</u>, 657 F.3d at 123.
In addition, "[i]t is well-established that mere disagreement
over the proper treatment does not create a constitutional claim.
So long as the treatment given is adequate, the fact that a
prisoner might prefer a different treatment does not give rise to
[a constitutional] violation." <u>Chance v. Armstrong</u>, <u>supra</u>, 143
F.3d at 703; <u>accord</u> <u>Thompson v. Racette</u>, 519 F. App'x 32, 34 (2d
Cir. 2013) (summary order).

      B.   Analysis of
          <u>Plaintiff's Claim</u>

         1.   Dismissal of
             <u>Dr. Lancelotti</u>

Dr. Lancellotti was named as a defendant in plaintiff's
First Amended Complaint; however, Dr. Lancellotti has never been
served (Defs.' Mem., at 1 n.2).  In my June 19, 2014 Order, I
directed plaintiff to serve or explain his failure to serve Dr.
Lancellotti no later than July 21, 2014, warning that noncompli-
ance would result in dismissal of the complaint against him for
failure to prosecute.  In a letter dated July 23, 2014, plaintiff
agreed that Dr. Lancellotti should be dismissed from the action
(Pl.'s Opp., at 43).

Accordingly, I dismiss all claims against Dr. Lancellotti.

### 2.   <u>Eleventh Amendment</u>

"The Eleventh Amendment, where applicable, deprives a federal court of jurisdiction.  Thus, prior to addressing the merits of [a] case [the Court] must first determine whether Eleventh Amendment immunity bars [its] jurisdiction."  <u>In re 995 Fifth Ave. Assocs.</u>, 963 F.2d 503, 506 (2d Cir. 1992) (citation omitted).  "The Eleventh Amendment bars the award of money damages against state officials in their official capacities." <u>Ford v. Reynolds</u>, 316 F.3d 351, 354 (2d Cir. 2003); <u>see</u> <u>also</u> <u>McMillian v. Monroe Cnty.</u>, 520 U.S. 781, 785 n.2 (1997); <u>Kentucky v. Graham</u>, 473 U.S. 159, 165-67 & n.19 (1985); <u>Edelman v. Jordan</u>, 415 U.S. 651, 663 (1974).

Accordingly, because Drs. Koenigsmann, Whalen and Makram are New York State officials, plaintiff's damages claims asserted against them in their official capacities are dismissed.

### 3.   Deliberate
     Indifference

Plaintiff claims that defendants were deliberately indifferent because (1) defendants delayed diagnosing and treat-

ing plaintiff's torn rotator cuff and ruptured biceps muscle and (2) defendants did not timely approve plaintiff's request to seek a second opinion or conduct a second MRI.

        a.    Delayed Diagnosis
              and Treatment

      Plaintiff claims that his ruptured biceps and torn rotator cuff were not timely diagnosed and treated because Dr. Makram denied Dr. Lancellotti's first MRI request and, after the second request was approved, the MRI was not conducted until more than four weeks after plaintiff was injured (Am. Compl. ¶¶ 21-22).  Plaintiff was not definitively diagnosed with a ruptured biceps muscle until he saw Dr. Holder more than three weeks after the MRI and more than seven weeks after the injury (Am. Compl. ¶¶ 25-26).  Plaintiff claims that Dr. Holder was unable to repair his ruptured biceps surgically by the time Dr. Holder saw plaintiff, because the muscle had degenerated to the point that performing surgery would have shredded the muscle, most likely causing extensive and irreversible damage and loss of function to plaintiff's arm and shoulder (Am. Compl. ¶¶ 27-28, 30, 72).  As a result, plaintiff claims that he expects to lose one-third of the strength in his right arm because the injuries are now irreversible and permanent (Am. Compl. ¶¶ 29, 74).  He also alleges that

he experienced "major pain for a very long period of time without much relief" (Pl.'s Opp., at 12).

                i.  Serious
                    <u>Medical Need</u>

"Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, [the Second Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years." <u>Demata v. N.Y. State Corr. Dep't of Health Servs.</u>, 198 F.3d 233, 1999 WL 753142 at *2 (2d Cir. 1999) (citations omitted); <u>accord</u> <u>White v. Nassau Cnty. Sheriff Dep't</u>, 14-CV-5203 (JS)(SIL), 2014 WL 5091793 at *3 (E.D.N.Y. Oct. 9, 2014).  These categories are not exclusive.

> [I]n <u>Brock v. Wright</u>, the Second Circuit held that a district court erred in ruling that only "extreme pain" or a "degenerative" condition would suffice to meet the legal standard for deliberative indifference.  315 F.3d 158, 163 (2d Cir. 2003).  The <u>Brock</u> court noted that "the Eighth Amendment forbids not only deprivations of medical care that produce physical torture and lingering death but also less serious denials which cause or perpetuate pain."  <u>Id</u>. (quoting <u>Todaro v. Ward</u>, 565 F.2d 48, 52 (2d Cir. 1977)).  The <u>Brock</u> court stated that an inmate is not required "to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his

or her condition will degenerate into a life threaten-
ing one." Id.

"There is no settled, precise metric to guide a
court in its estimation of the seriousness of a pris-
oner's medical condition." Id. at 162.  However, the
Second Circuit has set forth considerations that should
guide the analysis.  These considerations include (1)
whether a reasonable doctor or patient would perceive
the medical need in question as "important or worthy of
comment or treatment," (2) whether the medical condi-
tion significantly effects daily activities, and (3)
"the existence of chronic and substantial pain." See
Chance v. Armstrong, 143 F.3d 698, 702-703 (2d Cir.
1998) (quoting McGuckin v. Smith, 974 F.2d 1050, 1059-
60 (9th Cir. 1992)).

Sereika v. Patel, 411 F. Supp. 2d 397, 405-06 (S.D.N.Y. 2006)

(Marrero, D.J.).

Accepting plaintiff's allegations as true, plaintiff

has alleged facts that could potentially show that the lost

opportunity to repair plaintiff's muscle and the pain he experi-

enced as a result of the alleged delay in diagnosis and treatment

were objectively serious.  Several cases in this District have

involved similar allegations of injury based on delay, and each

has found the allegations sufficient to meet the objective prong

of a deliberate indifference claim.  See, e.g., Lloyd v. Lee, 570

F. Supp. 2d 556, 568 (S.D.N.Y. 2008) (Chin, then D.J., now Cir.

J.) (finding medical need sufficiently serious where plaintiff

was denied MRI for months for rotator cuff tear and torn left

shoulder tendon, resulting in degeneration, loss of mobility and

extreme pain); Sereika v. Patel, supra, 411 F. Supp. 2d at 406 (concluding that the objective prong was met by allegations of severe pain and reduced arm and shoulder mobility after eighteen-day delay of diagnosis of torn right pectoralis muscle that was no longer surgically reparable because of delay); Benjamin v. Schwartz, 299 F. Supp. 2d 196, 200-01 (S.D.N.Y. 2004) (McMahon, D.J.) (determining there was a sufficiently serious medical need where two-year delay in surgery to repair plaintiff's torn biceps muscle tendon and two other tendons resulted in muscle atrophy), aff'd, 204 F. App'x 979 (2d Cir. 2006).

Thus, plaintiff plausibly pled that his medical needs were sufficiently serious to satisfy the objective prong of a deliberate indifference claim.

### ii.  Culpable State of Mind

In order to survive defendants' motion, plaintiff, must also plausibly allege facts demonstrating that "the charged official[s] act[ed] or fail[ed] to act while actually aware of substantial risk that serious inmate harm w[ould] result." Salahuddin v. Goord, supra, 467 F.3d at 280 (emphasis added); accord Youmans v. City of N.Y., 12 Civ. 4071 (KMK), 2014 WL 1612997 at *6 (S.D.N.Y. Mar. 31, 2014) (Karas, D.J.).

## A.   Drs. Koenigsmann and Whalen

Plaintiff alleges that Drs. Koenigsmann and Whalen were deliberately indifferent to his serious medical needs because they (1) failed to ensure there were adequate guidelines for timely and adequate diagnosis and treatment of torn muscles and (2) failed to adequately train, manage and supervise Woodbourne's medical staff concerning the proper medical procedures (Am. Compl. ¶¶ 59-66, 68).  Plaintiff argues that the guidelines should require prompt MRI's to ensure that surgery for torn muscles occurs within two to three weeks of injury (Am. Compl. ¶ 62).  Oddly, defendants do not address this aspect of plaintiff's claims against Drs. Koenigsmann and Whalen and make no argument that plaintiff's complaint fails to allege that they acted with the required mental state.  Defendants' motion to dismiss with respect to these claims against Drs. Koenigsmann and Whalen is, therefore, denied.

## B.   Dr. Makram

Plaintiff claims that Dr. Makram was deliberately indifferent to plaintiff's serious medical needs by approving an x-ray when only an MRI would reveal a ruptured biceps and denying the initial request for plaintiff's MRI "based on purely finan-

cial considerations" (Am. Compl. ¶¶ 21, 66, 71-72). Plaintiff
claims that HSPM 6.4[17] required Dr. Makram to "promote constitu-
tionally adequate health care as effectively and economically as
possible"; as a result, he claims that Dr. Makram put financial
considerations over plaintiff's health, thereby denying the
initial MRI request and delaying diagnosis and treatment of
plaintiff's injuries (Pl.'s Opp., at 11, 37). Plaintiff argues
that Dr. Makram did so even though the MRI request noted that the
imaging should be performed "soon," and that she should have
known that failure to treat a rotator cuff tear as an emergency
could result in permanent damage (Pl.'s Opp., at 5-6, 10).

Defendants argue that plaintiff's allegations are
merely attacks on Dr. Makram's medical judgment as to when to
schedule the MRI (Defs.' Mem., at 10, citing Sonds v. St. Barna-
bas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y.
2001) (McMahon, D.J.)). In addition, defendants claim that
plaintiff's allegations are "baseless," "speculative and conclus-
ory" and that plaintiff has not alleged any facts supporting his

---

[17]HSPM 6.4 describes the role of Regional Health Services
Administrators who address administrative matters concerning
health services within their assigned regions, assist in
implementing health programs, advise on health services policies
and balance budgetary concerns with prisoners' healthcare needs
(Pl.'s Opp., at 37). Plaintiff has only provided the first page
of the two-page policy.

contention that the alleged denial was financially-motivated (Defs.' Mem., at 10).

Dr. Makram's approval of an x-ray while allegedly denying an MRI request, without more, would be a medical decision that would not meet the state of mind requirement for a deliberate indifference claim. Estelle v. Gamble, supra, 429 U.S. at 107 ("[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment . . . [which] does not represent cruel and unusual punishment."); accord Joyner v. Greiner, 195 F. Supp. 2d 500, 504-05 (S.D.N.Y. 2002) (McMahon, D.J.) (collecting cases).

However, I must accept as true plaintiff's claims that (1) an initial MRI request was denied by Dr. Makram, (2) the denial was financially-motivated and not based on sound medical judgment and (3) plaintiff's serious medical needs resulted from that delay. In Chance v. Armstrong, supra, 143 F.3d at 704, the Second Circuit addressed similar allegations of treatment decisions motivated by financial concerns:

> This allegation of ulterior motives, if proven true, would show that the defendant[] had a culpable state of mind and that [defendant's] choice of treatment was intentionally wrong and did not derive from sound medical judgment. It may be that [plaintiff] has no proof whatsoever of [defendant's] improper motive, and that lack of proof may become apparent at summary

34

judgment.  But even if [the court] think[s] it highly
unlikely that [plaintiff] will be able to prove his
allegations, that fact does not justify dismissal for
failure to state a claim, for "Rule 12(b)(6) does not
countenance . . . dismissals based on a judge's disbe-
lief of a complaint's factual allegations." <u>Neitzke v.
Williams</u>, 490 U.S. 319, 327, 109 S. Ct. 1827, 1832, 104
L.Ed.2d 338 (1989).  [The court] cannot say at this
stage that "'it appears beyond doubt that the plaintiff
can prove no set of facts in support of the claim which
would entitle him to relief.'"  <u>Staron v. McDonald's
Corp.</u>, 51 F.3d 353, 355 (2d Cir. 1995) (<u>quoting</u> <u>Conley
v. Gibson</u>, 355 U.S. 41, 45-46, 78 S. Ct. 99, 101-02, 2
L.Ed.2d 80 (1957)).  Accordingly, dismissal under Rule
12(b)(6) [is] inappropriate.

<u>See</u>, <u>e.g.</u>, <u>Jones v. Westchester Cnty. Dep't of Corr. Med. Dep't</u>,

557 F. Supp. 2d 408, 415-16 (S.D.N.Y. 2008) (McMahon, D.J.)

(concluding that plaintiff's allegations that his hip surgery was

cancelled and deemed non-urgent due to financial considerations

must be taken as true and defendants "jumped the gun by filing a

pre-answer motion to dismiss"); <u>Bob v. Armstrong</u>, No. 3:02CV1785

(RNC), 2003 WL 22682335 at *2 (D. Conn. Aug. 26, 2003) ("If

financial considerations induced [defendant] to ignore a substan-

tial risk of harm to [plaintiff], the subjective element of the

deliberate indifference test may be met.").

Here, too, plaintiff's allegation that Dr. Makram

denied the initial MRI request for purely financial reasons

without regard to plaintiff's health or sound medical judgment,

taken as true, satisfies the subjective prong at the pleading

stage.  Thus, defendants' motion to dismiss the deliberate

indifference claim against Dr. Makram for the delay in diagnosis and treatment of plaintiff's injuries is denied.

C.   Dr. Holder

Plaintiff alleges that Dr. Holder was deliberately indifferent by failing to immediately order a second MRI of plaintiff's shoulder, which was only partially visible on the initial scan, in order to diagnose the rotator cuff tear in a timely manner (Am. Compl. ¶ 80).[18]

As discussed above, the need for and timing of diagnostic tests are ordinarily medical determinations which, by themselves, cannot sustain a deliberate indifference claim.  Hathaway v. Coughlin, supra, 37 F.3d at 70; Sonds v. St. Barnabas Hosp. Corr. Health Servs., supra, 151 F. Supp. 2d at 312.  Plaintiff does not argue that Dr. Holder's failure to schedule a second MRI was financially-motivated or the product of any other improper motive.  Moreover, any allegation that Dr. Holder was deliberately indifferent because he failed to diagnose plaintiff's shoulder injury fails as a matter of law.  Harrison v. Barkley,

_____

[18]While Drs. John A. Mastrangelo and Phuong Vinh at Albany Medical Center read the initial MRI scan and saw a "[f]ull thickness re-tear of the supraspinatus tendon which [was] partially imaged," Dr. Holder, viewing the same image, determined there was no rotator cuff tear (Am. Compl., Exs. F & H).

219 F.3d 132, 139 (2d Cir. 2000) ("a delay in treatment based on

a bad diagnosis or . . . a mistaken decision not to treat based

on an erroneous view that the condition is benign or trivial or

hopeless" does not constitute an Eighth Amendment violation);

accord Williams v. Williams, 13 Civ. 3154 (RA), 2015 WL 568842 at

*6 (S.D.N.Y. Feb. 11, 2015) (Abrams, D.J.).

   Thus, defendants' motion to dismiss the deliberate

indifference claim against Dr. Holder for the delay in diagnosis

and treatment of plaintiff's shoulder injury is granted.

     b. Delay in Permitting a Second
       Opinion and a Second MRI

   Plaintiff also claims that defendants were deliberately

indifferent because (1) they initially denied his request for

permission to seek a second opinion and (2) after plaintiff

received Dr. Rubinovich's opinion, they did not timely authorize

or conduct a second MRI.  Defendants claim that (1) plaintiff did

ultimately receive a second opinion, (2) a second MRI was re-

quested as Dr. Rubinovich recommended, (3) the delay in obtaining

the second opinion did not cause serious injury and (4) whether

to allow a prisoner to seek a second opinion is a medical deci-

sion (Defs.' Mem., at 11).

i.  Serious
Medical Need

Plaintiff does not allege that the delay in receiving a
second opinion from Dr. Rubinovich and in scheduling a second MRI
of his shoulder caused an exacerbation of plaintiff's injuries.
Thus, this aspect of plaintiff's claim fails to satisfy the
objective prong of a deliberate indifference claim.  Neverthe-
less, even if this delay claim satisfied the objective prong of a
deliberate indifference claim, it fails to meet the subjective
prong.

ii.  Culpable
State of Mind

Plaintiff fails to allege that the defendants had a
sufficiently culpable state of mind with respect to his claim
that they improperly delayed his getting a second opinion and a
second MRI.

"[C]ourts in the Second Circuit have held that failure
to provide a second opinion is not generally a violation of a
prisoner's Eighth Amendment rights."  Youmans v. City of N.Y.,
supra, 14 F. Supp. 3d at 363-64 (collecting cases).  Whether and
when a second opinion should be sought is a matter of opinion as
to medical treatment and does not constitute deliberate indiffer-

38

ence.  See Youmans v. City of N.Y., supra, 14 F. Supp. 3d at 364;
Wilson v. Med. Unit Officials at George R. Vierno Ctr. Jail at
09-09 Hazen St., No. 10-CV-1438 (ARR)(RML), 2011 WL 6780934 at *4
(E.D.N.Y. Dec. 27, 2011).  Moreover, a prison doctor's disagree-
ment with the assessment or treatment recommendation of a con-
sulting physician is not, without more, deliberately indifferent
conduct.  Williams v. Smith, 02 Civ. 4558 (DLC), 2009 WL 2431948
at *9 (S.D.N.Y. Aug. 10, 2009) (Cote, D.J.).  Finally, plain-
tiff's claims that the delay was financially-motivated is implau-
sible, because the requests were ultimately granted and plaintiff
agreed to seek both the second opinion and the second MRI at his
own expense (See Pl.'s Opp., at 11-12).

Thus, defendants' motion to dismiss plaintiff's delib-
erate indifference claim based on the delay in seeking a second
opinion and second MRI is granted.

4.  Dr. Koenigsmann's Liability Under
a Theory of Respondeat Superior for
His Employees' Constitutional Violations

Plaintiff claims Dr. Koenigsmann is liable for the
unconstitutional actions of his employees, namely their deliber-
ate indifference, under a theory of respondeat superior (Am.

39

Compl. ¶¶ 84-87).[19]   Plaintiff also claims that Dr. Koenigsmann
was personally involved in the alleged constitutional violations
because (1) he was made aware of the violation of plaintiff's
rights through plaintiff's January 3, 2011 letter, plaintiff's
CORC appeal and communications from "administrative sources"; (2)
he ignored DOCCS policies, particularly HSPM 7.2 and (3) he
failed to supervise subordinates (Pl.'s Opp., at 14, 38).
Defendants claim Dr. Koenigsmann is not liable because he was not
personally involved, arguing that neither (1) Dr. Koenigsmann's
receipt and referral of plaintiff's letters to a subordinate; (2)
Dr. Koenigsmann's failure to investigate plaintiff's grievances
nor (3) plaintiff's broad statements that Dr. Koenigsmann was
informed of the violations are sufficient to prove personal
involvement (Defs.' Mem., at 12-13; Reply Memorandum of Law in
Support of Defendants' Motion to Dismiss the First Amended
Complaint, dated August 14, 2014, (Docket Item 65) ("Defs.'
Reply"), at 4-6).

          A supervisor cannot be held liable under Section 1983
under the doctrine of respondeat superior, Monell v. Dep't of

---

          [19]Plaintiff does not explicitly state whether this claim is
brought pursuant to state or federal law; however, I construe the
complaint broadly to assert respondeat superior liability under
both state and federal law.  I address the applicability of
respondeat superior to plaintiff's state law claims in Part
III.B.5.

Social Servs., 436 U.S. 658, 694 n.58 (1978); Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); personal involvement of the supervisor is required.  Leonhard v. United States, 633 F.2d 599, 621 n.30 (2d Cir. 1980).  "The personal involvement and liability of supervisory personnel is established when the supervisory official has 'actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act.'"  Rahman v. Fisher, 607 F. Supp. 2d 580, 584-85 (S.D.N.Y. 2009) (Cote, D.J.), citing Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989) (citation omitted), and Blyden v. Mancusi, 186 F.3d 252, 265 (2d Cir. 1999).

For purposes of Section 1983, personal involvement can be shown by

> (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003), citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995);[20] see Avenue

---

[20]The five types of personal involvement set forth in the text were first set forth in Colon v. Coughlin, supra, 58 F.3d at 873.  In Ashcroft v. Iqbal, supra, 556 U.S. at 677, decided in
(continued...)

v. New York, 157 F. App'x 375, 377 (2d Cir. 2005) (summary

order); Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003);

Lewis v. Fisher, 08-CV-3027 (JG)(LB), 2009 WL 689803 at *3

(E.D.N.Y. Mar. 12, 2009); Benitez v. Locastro, 9:04-CV-423 (NAM),

2008 WL 4767439 at *12 (N.D.N.Y. Oct. 29, 2008); Johnson v.

Wright, 234 F. Supp. 2d 352, 263 (S.D.N.Y. 2002) (Gorenstein,

M.J.) ("[T]he second example listed in Colon -- permitting

supervisory liability where a 'defendant, after being informed of

the violation through a report or appeal, failed to remedy the

wrong,' -- should not be too broadly construed."); Morris v.

Eversley, 205 F. Supp. 2d 234, 241-42 (S.D.N.Y. 2002) (Chin, then

D.J., now Cir. J.).

Plaintiff's letters to Dr. Koenigsmann do not satisfy

the requirement of personal involvement; although plaintiff sent

letters to Dr. Koenigsmann on January 3, 2011 and March 2, 2011,

both of those letters were referred to subordinate, Grinbergs,

---

[20](...continued)
2009, the Supreme Court rejected the argument that "a
supervisor's mere knowledge of his subordinate's discriminatory
purpose amounts to the supervisor's violating the constitution."
There is, therefore, some question as to whether all the types of
personal involvement described in Colon survive Iqbal.  See
generally Aguilar v. Immig. & Customs Enforcement Div., 811 F.
Supp. 2d 803, 814-15 (S.D.N.Y. 2011) (Koeltl, D.J.).  The Court
of Appeals has acknowledged that this issue remains unresolved.
Raspardo v. Carlone, 770 F.3d 97, 117 (2d Cir. 2014), citing
Reynolds v. Barrett, 685 F.3d 193, 205 n.14 (2d Cir. 2012).

who responded to plaintiff herself (Am. Compl. ¶¶ 33-34, 36 and Ex. I).  In addition, the mere fact that plaintiff filed a grievance of which Dr. Koenigsmann was allegedly aware through either the CORC appeal or "administrative sources" does not amount to personal involvement.

Although, as noted above, the Second Circuit has expressly held that supervisory liability can be shown by a "failure to remedy the alleged wrong after being informed through a report or appeal," Hernandez v. Keane, supra, 341 F.3d at 145, both the Second Circuit and numerous district courts within the Circuit have repeatedly held that "[r]eceipt of letters or grievances[, alone,] . . . is insufficient to impute personal involvement." Woods v. Goord, 01 Civ. 3255 (SAS), 2002 WL 731691 at *7 (S.D.N.Y. Apr. 23, 2002). See Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 2001) (finding no personal involvement where DOCCS Commissioner referred inmate's letter to subordinate); Yearney v. Sidorowicz, 13 Civ. 3604 (CM), 2014 WL 2616801 at *8-*9 (S.D.N.Y. June 10, 2014) (McMahon, D.J.) (concluding that Dr. Koenigsmann's delegation of inmate's letter to Grinbergs request-ing an MRI, among other things, and Grinbergs' subsequent re-sponse to inmate on Dr. Koenigsmann's behalf did not amount to personal involvement); McNair v. Kirby Forensic Psychiatric Ctr., 09 Civ. 6660 (SAS), 2010 WL 4446772 at *13 (S.D.N.Y. Nov. 5,

43

2010) (Scheindlin, D.J.) ("[M]ere notification of alleged wrong-doing does not establish personal involvement under Section 1983."). "Were it otherwise, virtually every prison inmate who sues for constitutional torts by prison [officials] could name the [supervisor] as a defendant since the plaintiff must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed upon by the [supervisor]." Thompson v. New York, 99 Civ. 9875 (GBD)(MHD), 2001 WL 636432 at *7 (S.D.N.Y. Mar. 15, 2001) (Daniels, D.J.) (internal citations omitted).

Plaintiff also claims that Dr. Koenigsmann was person-ally involved because he ignored "established policy" under HSPM 7.2, which states that an inmate's request to choose a "provider-of-choice [for consultation] may be granted" if certain condi-tions are met (Pl.'s Opp., at 14, 38). Plaintiff does not allege that Dr. Koenigsmann created the policy. Hernandez v. Keane, supra, 341 F.3d at 145 (personal involvement imputed where supervisor "creat[ed] a policy or custom that sanctioned conduct amounting to a constitutional violation"). Moreover, plaintiff's request pursuant to HSPM 7.2 was granted.

Finally, plaintiff claims Dr. Koenigsmann was person-ally involved because he "failed to supervise 'subordinates'" (Pl.'s Opp., at 14). In his complaint, plaintiff alleges that Dr. Koenigsmann "failed to adequately train, manage and super-

vise" Dr. Whalen as Dr. Whalen developed and updated "Clinical Practice Guidelines" and provided annual reports (Am. Compl. ¶ 60).  Personal involvement may be imputed where a supervisor engaged in "grossly negligent supervision of subordinates who committed a violation."  Hernandez v. Keane, supra, 341 F.3d at 145.  Although this aspect of the complaint may not adequately set forth a factual basis for the allegation of "grossly negligent supervision" and may not adequately allege causation, defendants do not challenge this theory of liability.  I decline to address the adequacy of this aspect of the complaint mea sponte because plaintiff has not had an opportunity to address the issue.  Thus, because plaintiff's underlying Eighth Amendment claim against Dr. Whalen survives dismissal, plaintiff's failure to train, manage and supervise claim against Dr. Koenigsmann also survives with respect to Dr. Whalen's actions.

Thus, plaintiff's claim that Dr. Koenigsmann is liable for Dr. Whalen's alleged indifference on a theory of personal involvement for failure to train, manage and supervise survives the motion to dismiss; as for the other claims against Dr. Koenigsmann, plaintiff has failed to plead an Eighth Amendment claim under either the doctrine of respondeat superior or a viable theory of personal involvement, and they are dismissed.

5.   Plaintiff's
State Law Claims

Plaintiff also brings state law claims for medical malpractice and negligence against all defendants (Am. Compl. ¶¶ 1, 76-84).  In addition, plaintiff claims that Dr. Koenigsmann is liable on a theory of respondeat superior "for the individual torts and/or negligence of each and every one of his employees, committed within the scope of their employment" (Am. Compl. ¶ 86).  Defendants rather oddly argue that (1) a claim of negligence is not cognizable under the Eighth Amendment; (2) plaintiff has failed to allege that defendants' claims amounted to "culpable recklessness" as required to allege a claim of medical malpractice under the Eighth Amendment and (3) Dr. Koenigsmann was not personally involved as needed to impose Section 1983 liability.[21]

Defendants' arguments do not make sense and appear to confuse the bases for Section 1983 liability with the bases for common law liability.  For example, although defendants are

_____

[21]Defendants fail to address plaintiff's pendent state law claims as such, and address them instead as if they were brought pursuant to Section 1983 as violative of the Eighth Amendment. Plaintiff clearly states his claims of negligence and medical malpractice are New York state law claims and he seeks to hold Dr. Koenigsmann liable for both the state torts and deliberate indifference of his employees under the theory of respondeat superior (Am. Compl. ¶¶ 1, 83, 86-87).

correct that negligent conduct does not give rise to an Eighth Amendment claim, state law claims are, by definition, not Eighth Amendment claims.  Similarly, "culpable recklessness"[22] is not an element of a common law medical malpractice claim.  DiGeronimo v. Fuchs, 101 A.D.3d 933, 936, 957 N.Y.S.2d 167, 170 (2d Dep't 2012) ("In order to establish the liability of a physician for medical malpractice, a plaintiff must prove that the physician deviated or departed from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries." (inner quotations omitted)).

Nevertheless, the Court lacks subject matter jurisdiction to entertain plaintiff's common law claims against defendants.

New York Corrections Law Section 24 provides, in pertinent part:

> 1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, which for purposes of this section shall include members of the state board of parole, in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

---

[22]"Culpable recklessness" appears to be a seldom used articulation for the subjective element of an Eighth Amendment deliberate indifference claim.  See Hernandez v. Keane, supra, 341 F.3d at 144.

2. Any claim for damages arising out of any act
done or the failure to perform any act within the scope
of the employment and in the discharge of the duties of
any officer or employee of the department shall be
brought and maintained in the court of claims as a
claim against the state.

Because a federal court hearing a claim under its supplemental

jurisdiction sits as if it were a state court, Section 24 oper-

ates as a limit on a federal court's subject matter jurisdiction

with respect to such claims.  Baker v. Coughlin, 77 F.3d 12, 15

(2d Cir. 1996).  As a limit on my subject matter jurisdiction, I

may (and should) raise it mea sponte.  Durant, Nichols, Houston,

Hodgson & Cortese-Costa P.C. v. Dupont, 565 F.3d 56, 62-63 (2d

Cir. 2009).

Section 24 does not bar Section 1983 claims against

DOCCS employees.  See Haywood v. Drown, 556 U.S. 729, 740-41

(2009).  However, it does mandate that state law claims for

damages for acts or omissions committed by DOCCS employees within

the scope of their employment be brought exclusively in the New

York Court of Claims as claims against New York State.  Baker v.

Coughlin, supra, 77 F.3d at 14-16; accord Tavares v. New York

City Health & Hosps. Corp., 13 Civ. 3148 (PKC)(MHD), 2015 WL

158863 at *10 (S.D.N.Y. Jan. 13, 2015) (Castel, D.J.).

Thus, pursuant to Section 24, the plaintiff's common law claims against the defendants in their individual capacities are dismissed for lack of subject matter jurisdiction.

6.  Qualified Immunity

Because plaintiff has failed to state claims on which relief can be granted against Dr. Holder, I need not address the defendants' argument that he is entitled to qualified immunity. Robles v. Khahaifa, No. 09CV718, 2012 WL 2401574 at *9 (W.D.N.Y. June 25, 2012) ("Given that no constitutional violation was found, this Court need not address defendants' alternative contention that they deserve qualified immunity for their actions."). However, because constitutional claims against Drs. Koengismann, Whalen and Makram survive dismissal, I shall address defendants' qualified immunity claims with regards to them.

Defendants claim that Drs. Koenigsmann and Whalen are entitled to qualified immunity because "their involvement was limited and associated with letters . . . requesting permission to seek a second-opinion [sic]" (Defs.' Mem., at 14). However, defendants do not explain why Drs. Koenigsmann and Whalen are entitled to qualified immunity for plaintiff's claims which survive dismissal, i.e., that the doctors were deliberately indifferent in delaying diagnosis and treatment of plaintiff's

49

injuries.  Thus, defendants' motion to dismiss the claims against Drs. Koenigsmann and Makram on the ground of qualified immunity is denied.

Defendants claim that Dr. Makram is entitled to qualified immunity because she did not violate a clearly established constitutional right, and she made her decisions based on the medical evidence before her and her own medical judgment, making it "reasonable for her to believe her actions were not demonstrative [of] medical deliberate indifference" (Defs.' Mem., at 13, 15; Defs.' Reply, at 3, 4, 7-8).  Plaintiff argues that Dr. Makram knew that denying the initial MRI request was a violation of plaintiff's constitutional right (Pl.'s Opp., at 16).

> A government agent enjoys qualified immunity when he or she performs discretionary functions if either (1) the conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that the conduct did not violate clearly established rights.  A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he or she is doing violates that right.  The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct.  The unlawfulness must be apparent.

McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 278 (2d Cir. 1999); accord Coggins v. Buonora, 776 F.3d 108, 114 (2d Cir. 2015).  See Anderson v. Creighton, 483 U.S. 635, 638-39

(1987); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Connell
v. Signoracci, 153 F.3d 74, 80 (2d Cir. 1998).

It was clearly established by 2010 that the Eighth
Amendment prohibited prison officials from being deliberately
indifferent to an inmate's serious medical needs.  See Estelle v.
Gamble, supra, 429 U.S. at 104; LaBounty v. Coughlin, 137 F.3d
68, 74 (2d Cir. 1998); Wright v. Dee, 54 F. Supp. 2d 199, 204
(S.D.N.Y. 1999) (Cote, D.J.); Abdush-Shahid v. Coughlin, 933 F.
Supp. 168, 185 (N.D.N.Y. 1996).

Accordingly, dismissal on the basis of qualified
immunity can be granted only if the conduct of Dr. Makram was
objectively reasonable.  An official's conduct is "objectively
reasonable" if reasonable, similarly-situated officials could
disagree as to its legality.  Spavone v. N.Y. State Dep't. of
Corr. Servs., supra, 719 F.3d at 135; Danahy v. Buscaglia, 134
F.3d 1185, 1190 (2d Cir. 1998).

Qualified immunity issues frequently arise in connec-
tion with false arrest and similar claims involving the legality
of actions by law enforcement officers.  This is a subject matter
with which courts are familiar.  It is frequently not difficult
for a court to review a set of facts and determine whether
probable cause existed or whether a police officer acted reason-

ably in concluding that his or her actions did not violate the Constitution.

This case involves issues of medical judgment which are foreign to me.  Apart from the minimal allegations by plaintiff that Dr. Makram's denial of the initial MRI was financially-motivated, there is not enough information in the record to permit me to determine whether she acted reasonably or unreasonably.  Without additional information, it is impossible to determine whether other physicians of reasonable competence could disagree on her conduct.  See Walter v. Schult, supra, 717 F.3d at 130; Paulin v. Figlia, 916 F. Supp. 2d 524, 536-37 (S.D.N.Y. 2013) (Briccetti, D.J.); Giambalvo v. Sommer, 10 Civ. 6774 (JPO), 2012 WL 4471532 at *7 (S.D.N.Y. Sept. 19, 2012) (Oetken, D.J.); Edmonds v. Cent. N.Y. Psychiatric Ctr., supra, 2011 WL 3809913 at *6-*7.

Thus, I conclude that Dr. Makram's motion to dismiss on the ground of qualified immunity is denied.

IV.  Conclusion

Accordingly, for all the foregoing reasons, defendants' motion to dismiss this action is granted in part and denied in part.

Defendants' motion to dismiss all claims against Drs. Lancellotti and Holder is granted.

All of plaintiff's claims against Drs. Whalen and Makram are dismissed except plaintiff's deliberate indifference claims for the delay in diagnosis and treatment of plaintiff's injuries.

All of plaintiff's claims against Dr. Koenigsmann are dismissed except plaintiff's claim of deliberate indifference for:  (1) the delay in diagnosis and treatment of plaintiff's injuries and (2) plaintiff's claim of liability for Dr. Whalen's deliberate indifference under a theory of personal involvement for failure to train and supervise Dr. Whalen.

All of plaintiff's state law claims for negligence, medical malpractice and claims based on the doctrine of respondeat superior are dismissed.

Dated:   New York, New York
         March 20, 2015

SO ORDERED

_HENRY PITMAN_
United States Magistrate Judge

53

Copies mailed to:

Frank A. DeMeo
DIN 84-A-2139
Fishkill Correctional Facility
271 Matteawan Road
P.O. Box 1245
Beacon, New York  12508

Jason M. Clark, Esq.
Assistant Attorney General
State of New York
24th Floor
120 Broadway
New York, New York  10271