UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

FRANK A. DeMEO,                        :

                    Plaintiff,         :

     -against-                         :     11 Civ. 7099 (HBP)

CARL J. KOENIGSMANN, MD, Deputy        :     OPINION
Commissioner, Chief Medical                  AND ORDER
Officer, N.Y.S. Department             :
of Correction and Community
Supervision, in an official            :
capacity, et al.,
                                       :
                    Defendants.
                                       :
------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/7/17

          PITMAN, United States Magistrate Judge:


I.   Introduction


          Plaintiff Frank A. DeMeo, a former inmate in the

custody of the New York State Department of Corrections and

Community Supervision ("DOCCS"), proceeding pro se, commenced

this action against defendants Drs. Carl J. Koenigsmann, Timothy

Whalen, Mervat Makram, Jonathan Holder and Frank Lancellotti,

pursuant to 42 U.S.C. § 1983, alleging that defendants were

deliberately indifferent to injuries to his right shoulder and

biceps muscle that were sustained during his incarceration at

Woodbourne Correctional Facility ("Woodbourne").  Plaintiff also

asserts state law claims for medical malpractice and negligence

against defendants. Plaintiff seeks damages, as well as declaratory and injunctive relief. By notice of motion dated January 28, 2016, Drs. Koenigsmann, Whalen and Makram move for summary judgment (Notice of Motion, dated Jan. 28, 2016 (Docket Item ("D.I.") 91).

The parties have consented to my exercising plenary jurisdiction over this matter pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, defendants' motion for summary judgment is granted and the complaint is dismissed.

II. Facts

A. Background

Plaintiff had been in DOCCS custody since 1984 (Declaration of Steven N. Schulman, Esq., dated Jan. 28, 2016 (D.I. 96) ("Schulman Decl."), Ex. D, at 13:17-13:23). He arrived at Woodbourne in June 2007 (Schulman Decl., Ex. D, at 15:5-15:9).

Plaintiff had surgery on his shoulders before the alleged events that give rise to this action. In 2003, surgery was performed on his left shoulder to repair a torn rotator cuff (Schulman Decl., Ex. D, at 12:5-12:9). In 2005, a cyst was surgically removed from plaintiff's right shoulder (Schulman Decl., Ex. D, at 12:5-12:11). In 2007, plaintiff's right rotator

cuff was surgically repaired (Schulman Decl., Ex. D, at 12:5-
12:12). As a result of the 2003 and 2007 surgeries, plaintiff
has metallic screws in both shoulders (Schulman Decl., Ex. D, at
12:20-12:25, 34:13-34:17 & Ex. F, at MED068-70).

B.  The Injury

        On October 13, 2010, plaintiff was working as a porter
in Woodbourne's gym, storing dumbbells on their racks, when he
"felt something pop" in his right arm (Schulman Decl., Ex. D, at
19:13-19:17). Prior to that injury, plaintiff had noticed a
"clicking" in his right arm for weeks and "felt that something
was going to happen" (Schulman Decl., Ex. D, at 25:23-26:4).

        Plaintiff immediately reported his injury to a correc-
tion officer, who called the infirmary (Schulman Decl., Ex. D, at
19:18-19:20). The infirmary said that plaintiff's injury did not
warrant an emergency sick call (Schulman Decl., Ex. D, at 19:21-
19:25). After waiting a day or two to see how he felt, plaintiff
signed up for regular sick call due to discomfort and a signifi-
cant loss of strength in his right arm and shoulder (Schulman
Decl., Ex. D, at 24:22-25:1).

3

C. The Diagnosis

Plaintiff was seen by a nurse at regular sick call on October 18, 2010; by that date, plaintiff's arm had turned black and blue (Schulman Decl., Ex. D, at 22:5-22:9, 25:2; Declaration of Dr. Mervat Makram, dated Jan. 14, 2016 (D.I. 95) ("Makram Decl."), Ex. A, at MED136). After noting a bruise on plaintiff's biceps and an "obvious deformity," the nurse referred plaintiff to a physician's assistant, Genevieve Switz, who saw plaintiff the same day (Schulman Decl., Ex. D, at 25:2-25:4; Makram Decl. ¶ 7 & Ex. A, at MED136). Switz also noted a bruise on the biceps, but reported that plaintiff had "no pain" and "no loss of strength" (Makram Decl., Ex. A, at MED136). Switz diagnosed plaintiff with a "possible rupture of the proximal biceps ten-don," i.e., a rupture at the shoulder end of the biceps (Makram Decl. ¶ 7 & Ex. A, at MED136). Switz requested a referral for magnetic resonance imaging ("MRI"), directed plaintiff to wear a sling until the MRI report was available and restricted plain-tiff's activities (Makram Decl., Ex. A, at MED136). Plaintiff wore the sling for approximately one week (Schulman Decl., Ex. D, at 55:12-55:14).

An x-ray was also taken that same day (Schulman Decl., Ex. D, at 29:10-30:13). A report dated October 21, 2010 and

4

reviewed by Dr. Makram on October 26, 2010 did not disclose a ruptured biceps or torn rotator cuff based on the x-ray (Makram Decl. ¶ 8 & Ex. B, at MED068). However, according to Dr. Makram, the lack of such findings was inconclusive because an MRI is more effective than an x-ray in revealing soft tissue injuries (Makram Decl. ¶ 8).

Approval for the MRI required analysis under DOCCS's "utilization review process" for specialist referrals (Schulman Decl., Ex. H; Makram Decl. ¶ 9). Switz and Dr. Lancellotti, plaintiff's primary care physician, initiated the utilization review process the same day that Switz saw plaintiff by electronically entering a request into DOCCS's computer system with an urgency level of "soon"; this designation meant that the MRI should be provided within two weeks (Makram Decl. ¶ 10 & Ex. B, at MED1821). Switz also noted that there were metal fragments in plaintiff's left shoulder (Makram Decl. ¶ 11 & Ex. B, at MED069). DOCCS's contracted utilization reviewer, APS,[1] reviewed the request that same day and determined to defer the decision pending more information (Makram Decl. ¶ 12 & Ex. B, at MED1822). Specifically, APS wanted to know whether any weakness or instability was noted on physical examination (Makram Decl. ¶ 12 & Ex.

---

[1]The record does not disclose APS's formal name.

5

B, at MED1822). On October 21, 2010, Dr. Lancellotti informed
APS that plaintiff had "bulging of biceps toward elbow on flexio-
n; decreased motor ability to flex @ elbow; weakness of mus-
cle[]distal [sic] to shoulder; large hematoma on flexor side of
upper arm" (Makram Decl. ¶ 13 & Ex. B, at MED1822). Based on
this information, on October 22, 2010, APS approved the MRI on a
"soon" basis (Makram Decl. ¶ 13 & Ex. B, at MED1822).

The first radiologist contacted to conduct the MRI
refused to do so because of the metal screws in plaintiff's
shoulders; according to Dr. Makram, metallic objects in the body
require special safety precautions and could adversely affect the
images produced by the MRI (Makram Decl. ¶ 16). Accordingly, Dr.
Makram spent several days trying to find a radiologist willing to
conduct the MRI at a location suitable for a medium security
inmate (Makram Decl. ¶ 16). Albany Medical Center agreed to
perform the MRI, which took place on November 15, 2010 (Schulman
Decl., Ex. D, at 36:20-36:21; Makram Decl. ¶¶ 16, 18).

Dr. Makram's only role concerning the MRI was finding a
radiologist willing to perform it (Makram Decl. ¶ 17). At no
point did Dr. Makram disapprove the MRI, nor was she involved in
APS's request for more information (Makram Decl. ¶ 17).[2]

---

[2]Plaintiff testified at his deposition that he believed Dr.
(continued...)

Dr. Whalen was not involved in approving the MRI (Makram Decl. ¶ 15). As Regional Medical Director, Dr. Whalen would not have been involved in the utilization review process unless APS preliminarily denied the request for an MRI, which did not occur here (Schulman Decl., Ex. H ¶ III.A.4; Makram Decl. ¶ 15).[3]

---

[2](...continued)
Makram delayed his MRI (Schulman Decl., Ex. D, at 35:11-35:13). Plaintiff's belief was based on a conversation with Dr. Lancellotti, in which Dr. Lancellotti allegedly said that "every time he put something in regarding procedures or surgeries, that Dr. Makram [was] overriding his request" (Schulman Decl., Ex. D, at 35:11-35:23). However, while such a statement would be an admission if offered against Dr. Lancellotti, it is inadmissible hearsay as to the other defendants. Realuyo v. Diaz, 98 Civ. 7684 (GBD), 2006 WL 695683 at *5 (S.D.N.Y. Mar. 17, 2006) (Daniels, D.J.) (statement of one defendant not admissible against other defendant); Mueller v. County of Westchester, 943 F. Supp. 357, 359 n.2 (S.D.N.Y. 1996) (Rakoff, D.J.) (same), aff'd, 122 F.3d 1056 (2d Cir. 1997) (summary order); see O'Neal v. Esty, 637 F.2d 846, 850-51 (2d Cir. 1980) (out-of-court statement is not hearsay when offered against the party who made the statement). Hearsay statements are inadmissible on a motion for summary judgment and cannot create a genuine issue of fact. ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 151 (2d Cir. 2007); Capobianco v. City of New York, 422 F.3d 47, 55 (2d Cir. 2005); Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004); ABB Indus. Sys., Inc. v. Prime Tech., Inc., 120 F.3d 351, 357 (2d Cir. 1997); Hamad v. Cook, 13 Civ. 3222 (MHD), 2014 WL 3507340 at *4 (S.D.N.Y. June 30, 2014) (Dolinger, M.J.).

[3]Although plaintiff testified that it was his "understand-ing" that Dr. Whalen disapproved the request for an MRI (Schulman Decl., Ex. D, at 65:19-66:1), based on comments by Dr. Lancellotti (Schulman Decl., Ex. D, at 33:5-33:25), such comments by Dr. Lancellotti are hearsay as to the remaining defendants and, therefore, inadmissible.

There is no evidence in the record indicating that Dr. Koenigsmann was involved in the approval of plaintiff's MRI. As Chief Medical Officer, Dr. Koenigsmann would not have ordinarily been involved in the approval of an injury-related MRI (Makram Decl. ¶ 15).

The MRI report, dated November 22, 2010, arrived at Woodbourne on November 29, 2010; Dr. Makram reviewed it on December 1, 2010 (Makram Decl. ¶ 18 & Ex. B, at MED1191). The report stated that plaintiff had a "full thickness retracted proximal biceps tendon rupture" with an approximately eight-centimeter distal retraction of the biceps tendon, "a large amount of surrounding fluid" and no evidence of muscle atrophy (Makram Decl., Ex. B, at MED1191). It also stated that plaintiff had a "full thickness re-tear of the supraspinatus tendon"[4] (Makram Decl., Ex. B, at MED1191). Dr. Makram referred the report to Dr. Lancellotti (Makram Decl. ¶ 18).

Plaintiff met with Dr. Lancellotti on December 2, 2010 (Schulman Decl., Ex. D, at 42:7-42:14; Makram Decl., Ex. B, at MED090). Dr. Lancellotti informed plaintiff of the MRI results

---

[4]The supraspinatus tendon "links the supraspinatus muscle to the shoulder joint, allowing the muscle to perform its primary function of lifting the arm away from the side of the body and is one of four tendons that make up the rotator cuff." Smith v. Colvin, No. 12-CV-5573, 2013 WL 4519782 at *8 n.41 (E.D.N.Y. Aug. 26, 2013) (internal quotation marks omitted).

and requested a referral for plaintiff to see Dr. Holder, an orthopedic specialist, on a "soon" basis (Schulman Decl., Ex. D, at 44:10-44:19 & Ex. F, at MED090).

Plaintiff saw Dr. Holder on December 9, 2010, at which time Dr. Holder reviewed the MRI images (Schulman Decl., Ex. D, at 40:23-41:17, 44:20-44:22; Makram Decl., Ex. B, at MED090). Dr. Holder reported that an examination of plaintiff's right shoulder indicated that plaintiff had a full range of motion with no restrictions, "no impingement or O'Brien's,"[5] no weakness on abduction or flexing and "[positive] Biceps Belly deformity"[6] (Makram Decl., Ex. B, at MED090). He also noted that there was "[n]o clinical Rot[ator] Cuff tear-determined [and that no] orthopedic intervention [was warranted] at [that] time" (Makram Decl., Ex. B, at MED090). Dr. Holder opined that the MRI "reveal[ed] long head Biceps rupture -- supraspinatus tear," and he opined that plaintiff's right biceps was "rupture-chronic -- not surgically amenable for repair at this time" (Makram Decl.,

---

[5]The O'Brien's test "is a test for injury to the supraspinatus muscle or superior labrum of the shoulder joint." Dettmer v. Astrue, No. 4:10-CV-1329 (CEJ), 2011 WL 3904429 at *5 n.17 (E.D. Mo. Sept. 6, 2011).

[6]The belly is "the fleshy contractile part of a muscle." Dorland's Illustrated Medical Dictionary 208 (32nd ed. 2012).

Ex. B, at MED090).[7]  Dr. Lancellotti reviewed Dr. Holder's find-
ings with plaintiff on December 23, 2010 (Schulman Decl., Ex. D,
at 53:9-53:20; Makram Decl., Ex. A, at MED132).

## D.  Return to Activities

On December 31, 2010, plaintiff requested that medical
restrictions that had been in place be lifted and that he be
allowed to return to work (Schulman Decl., Ex. D, at 56:23-57:6;
Makram Decl., Ex. B, at MED115).  Dr. Lancellotti cleared plain-
tiff for "full duty" as a porter (Schulman Decl., Ex. D, at
57:19-58:12 & Ex. F, at MED103), although plaintiff testified
that he did not "really perform any weight room activities or
porter work" because "there's other porters there[] [a]nd [his]
boss at that time, he gave [plaintiff] a lot of leeway" (Schulman
Decl., Ex. D, at 58:13-58:22).

Plaintiff ultimately resumed lifting weights because
his pain had ceased and he had a full range of motion (Schulman
Decl., Ex. D, at 59:2-59:9).  He continued this activity until

---

[7]According to plaintiff, Dr. Holder also allegedly said that
plaintiff "should have been brought to him a little faster
because bicep injuries have to be done within weeks [of the
injury]" (Schulman Decl., Ex. D, at 47:13-47:16).  However, while
such a statement would be an admission by Dr. Holder, it is
hearsay as to the other defendants.  See footnote 2, supra.

November 29, 2011, when he was disciplined for fighting (Schulman Decl., Ex. D, at 59:10-60:7).

By late 2011, plaintiff had a second MRI, which revealed a torn right rotator cuff (Schulman Decl., Ex. D, at 60:25-61:21). This tear was surgically repaired in June 2012, when plaintiff was in the Clinton Correctional Facility (Schulman Decl., Ex. D, at 61:22-62:1). Plaintiff never had surgery on his biceps (Schulman Decl., Ex. D, at 12:7).

E.   Relevant Procedural History

Plaintiff commenced this action pro se on October 3, 2011 (Complaint, dated Oct. 3, 2011 (D.I. 2)). He asserted claims against Drs. Koenigsmann, Whalen and Makram in their individual and official capacities and against Drs. Holder and Lancellotti in their individual capacities. Plaintiff alleged that defendants (1) were deliberately indifferent to his right biceps and shoulder injuries by delaying the diagnosis and treatment of his injuries; (2) were deliberately indifferent by denying a request to seek a second medical opinion and a second MRI; (3) were negligent and (4) committed medical malpractice (First Amended Complaint, dated May 15, 2012 (D.I. 45) ("Am. Compl.") ¶¶ 1, 15-83). Plaintiff also alleged that Dr. Koenigsmann was liable under a theory of respondeat superior (Am.

11

Compl. ¶¶ 84-87). Plaintiff sought three million dollars in
compensatory damages for physical and emotional injury, a declar-
atory judgment that defendants violated his Eighth Amendment
rights and an injunction ordering defendants "to carry out
without delay adequate medical care of Plaintiff[']s injuries and
to not impede in any manner Plaintiff[']s physicians['] provision
of adequate medical care" (Am. Compl., at 20).

On June 2, 2014, defendants moved to dismiss plain-
tiff's claims against them (Notice of Motion, dated June 2, 2014
(D.I. 62)). I issued an Opinion and Order on March 20, 2015
granting the motion in part and denying it in part. Specifi-
cally, I dismissed all claims against Drs. Lancellotti and Holder
(Opinion and Order, dated Mar. 20, 2015 (D.I. 67) ("Opinion and
Order"), at 53). I also dismissed all claims against Drs.
Koenigsmann, Whalen and Makram in their official capacities
(Opinion and Order, at 27). Additionally, I dismissed all of
plaintiff's claims concerning his allegation that defendants were
deliberately indifferent in delaying a referral for a second
opinion and second MRI after Dr. Holder's December 9, 2010
evaluation (Opinion and Order, at 37-39). I also dismissed
plaintiff's state law claims and claims based on the doctrine of
respondeat superior (Opinion and Order, at 53). However, I
concluded that plaintiff plausibly alleged an Eighth Amendment

12

claim against Drs. Koenigsmann, Whalen and Makram in their individual capacities with respect to whether they were deliberately indifferent and thereby unduly delayed plaintiff's MRI and the referral to Dr. Holder (Opinion and Order, at 27-36).

On August 31, 2016, Drs. Koenigsmann, Whalen and Makram filed the present motion seeking summary judgment with respect to the remaining claims against them (Notice of Motion, dated Jan. 28, 2016 (D.I. 91)). Plaintiff submitted his opposition to my chambers by letter dated December 28, 2016.[8]

III. Analysis

    A. Applicable Principles

        1. Summary Judgment Standards

The standards applicable to a motion for summary judgment are well-settled and require only brief review.

> Summary judgment may be granted only where there is no genuine issue as to any material fact and the moving party . . . is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). In ruling on a motion for

---

[8]Plaintiff's opposition will be docketed contemporaneously with the docketing of this Opinion and Order.

The opposition references letters by plaintiff dated July 25, 2016 and September 12, 2016. These letters do not appear on the Court's ECF system, nor are they contained in my files for this matter.

13

summary judgment, a court must resolve all ambiguities
and draw all factual inferences in favor of the
nonmoving party.  Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).
To grant the motion, the court must determine that
there is no genuine issue of material fact to be tried.
Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.
Ct. 2548, 91 L.Ed.2d 265 (1986).  A genuine factual
issue derives from the "evidence [being] such that a
reasonable jury could return a verdict for the nonmovi-
ng party."  Anderson, 477 U.S. at 248, 106 S. Ct. 2505.
The nonmoving party cannot defeat summary judgment by
"simply show[ing] that there is some metaphysical doubt
as to the material facts," Matsushita Elec. Indus. Co.
v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct.
1348, 89 L.Ed.2d 538 (1986), or by a factual argument
based on "conjecture or surmise," Bryant v. Maffucci,
923 F.2d 979, 982 (2d Cir. 1991).  The Supreme Court
teaches that "all that is required [from a nonmoving
party] is that sufficient evidence supporting the
claimed factual dispute be shown to require a jury or
judge to resolve the parties' differing versions of the
truth at trial."  First Nat'l Bank of Ariz. v. Cities
Serv. Co., 391 U.S. 253, 288-89, 88 S. Ct. 1575, 20
L.Ed.2d 569 (1968); see also Hunt v. Cromartie, 526
U.S. 541, 552, 119 S. Ct. 1545, 143 L.Ed.2d 731 (1999).
It is a settled rule that "[c]redibility assessments,
choices between conflicting versions of the events, and
the weighing of evidence are matters for the jury, not
for the court on a motion for summary judgment."
Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997).

McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006) (brackets in

original); accord Reeves v. Sanderson Plumbing Prods., Inc., 530

U.S. 133, 150-51 (2000)[9]; Estate of Gustafson ex rel. Reginella

---

[9]Although the Court in Reeves was reviewing the denial of a
motion for judgment as a matter of law pursuant to Fed.R.Civ.P.
50, the same standards apply to a motion for summary judgment
pursuant to Fed.R.Civ.P. 56.  Reeves v. Sanderson Plumbing
Prods., Inc., supra, 530 U.S. at 150-51.

v. Target Corp., 819 F.3d 673, 675 (2d Cir. 2016); Cortes v. MTA

N.Y.C. Transit, 802 F.3d 226, 230 (2d Cir. 2015); Deep Woods

Holdings, L.L.C. v. Savings Deposit Ins. Fund of Republic of

Turk., 745 F.3d 619, 622-23 (2d Cir. 2014); Hill v. Curcione, 657

F.3d 116, 124 (2d Cir. 2011).

"Material facts are those which 'might affect the

outcome of the suit under the governing law' . . . ." Coppola v.

Bear Stearns & Co., 499 F.3d 144, 148 (2d Cir. 2007), quoting

Anderson v. Liberty Lobby, Inc., supra, 477 U.S. at 248. "'[I]n

ruling on a motion for summary judgment, a judge must ask himself

not whether he thinks the evidence unmistakably favors one side

or the other but whether a fair-minded jury could return a

verdict for the [non-movant] on the evidence presented[.]'" Cine

SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 788 (2d Cir. 2007)

(second alteration in original), quoting Readco, Inc. v. Marine

Midland Bank, 81 F.3d 295, 298 (2d Cir. 1996).

Entry of summary judgment is appropriate "against a

party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."

Celotex Corp. v. Catrett, supra, 477 U.S. at 322. "In such a

situation, there can be 'no genuine issue as to any material

fact,' since a complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, <u>supra</u>, 477 U.S. at 322-23, <u>quoting</u> Fed.R.Civ.P. 56.

Lastly, where, as here, a party is proceeding <u>pro se</u>, his submissions "must be construed liberally and interpreted 'to raise the strongest arguments that they <u>suggest</u>.'" <u>Triestman v. Federal Bureau of Prisons</u>, 470 F.3d 471, 474 (2d Cir. 2006) (<u>per curiam</u>) (emphasis in original), <u>quoting</u> <u>Pabon v. Wright</u>, 459 F.3d 241, 248 (2d Cir. 2006); <u>see</u> <u>also</u> <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972) (<u>per</u> <u>curiam</u>); <u>Graham v. Henderson</u>, 89 F.3d 75, 79 (2d Cir. 1996); <u>Burgos v. Hopkins</u>, 14 F.3d 787, 790 (2d Cir. 1994). This rule applies with particular force when evaluating motions for summary judgment. <u>Graham v. Lewinski</u>, 848 F.2d 342, 344 (2d Cir. 1988) ("[S]pecial solicitude should be afforded <u>pro</u> <u>se</u> litigants . . . when confronted with motions for summary judgment."), <u>citing</u> <u>Sellers v. M.C. Floor Crafters, Inc.</u>, 842 F.2d 639, 642 (2d Cir. 1988).

## 2. Section 1983

Section 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights,

> privileges, or immunities secured by the Constitution
> and laws, shall be liable to the party injured . . . .

In order to establish a claim under Section 1983, a plaintiff must show that "(1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994), citing Parratt v. Taylor, 451 U.S. 527, 535 (1981), overruled on other grounds, Daniel v. Williams, 474 U.S. 327 (1986); accord Fiedler v. Incandela, 222 F. Supp. 3d 141, 156 (E.D.N.Y. 2016); Guttilla v. City of New York, 14 Civ. 156 (JPO), 2015 WL 437405 at *5 (S.D.N.Y. Feb. 3, 2015) (Oetken, D.J.); Davis v. Lynbrook Police Dep't, 224 F. Supp. 2d 463, 475 (E.D.N.-Y. 2002). "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986), quoting McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977); accord Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013); Lebron v. Mrzyglod, 14 Civ. 10290 (KMK), 2017 WL 365493 at *3 (S.D.N.Y. Jan. 24, 2017) (Karas, D.J.). Personal involvement can be shown by

> (1) actual direct participation in the constitutional
> violation, (2) failure to remedy a wrong after being

17

> informed through a report or appeal, (3) creation of a
> policy or custom that sanctioned conduct amounting to a
> constitutional violation, or allowing such a policy or
> custom to continue, (4) grossly negligent supervision
> of subordinates who committed a violation, or (5)
> failure to act on information indicating that unconsti-
> tutional acts were occurring.

Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003), citing

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995); accord Warren

v. Pataki, 823 F.3d 125, 136 (2d Cir. 2016), cert. denied sub

nom., Brooks v. Pataki, 137 S. Ct. 380 (2016); Guillory v. Cuomo,

616 F. App'x 12, 13 (2d Cir. 2015) (summary order); Littlejohn v.

City of New York, 795 F.3d 297, 314 (2d Cir. 2015); Richardson v.

Goord, 347 F.3d 431, 435 (2d Cir. 2003) (per curiam); Lewis v.

Fischer, No. 08-CV-3027 (JG)(LB), 2009 WL 689803 at *3 (E.D.N.Y.

Mar. 12, 2009); Benitez v. Locastro, No. 9:04-CV-423, 2008 WL

4767439 at *12 (N.D.N.Y. Oct. 29, 2008); Johnson v. Wright, 234

F. Supp. 2d 352, 363 (S.D.N.Y. 2002) (Gorenstein, M.J.) ("[T]he

second example listed in Colon -- permitting supervisory liabil-

ity where a 'defendant, after being informed of the violation

through a report or appeal, failed to remedy the wrong,' --

should not be too broadly construed."); Morris v. Eversley, 205

F. Supp. 2d 234, 241 (S.D.N.Y. 2002) (Chin, then D.J., now Cir.

J.).[10]  A supervisor cannot be held liable under Section 1983

---

[10]In Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009), the Su-
(continued...)

18

under the doctrine of respondeat superior, Monell v. Department of Soc. Servs., 436 U.S. 658, 691 (1978); personal involvement of the supervisor is required. Leonhard v. United States, 633 F.2d 599, 621 n.30 (2d Cir. 1980).

### a. Deliberate Indifference

The Eighth Amendment of the United States Constitution, made applicable to the states by the Fourteenth Amendment, prohibits cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 101 & n.6 (1976). Under the Eighth and the Fourteenth Amendments, the states have a limited obligation to provide medical care to sentenced prisoners. Medina v. Buther, 15 Civ. 1955 (LAP), 2017 WL 700744 at *8 (S.D.N.Y. Feb. 3, 2017) (Preska, D.J.), citing Estelle v. Gamble, supra, 429 U.S. at 103-04. "'[D]eliberate indifference to [the] serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of

---

[10](...continued)
preme Court rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." Although the Second Circuit had acknowledged that it was an open issue whether all of the types of personal involvement outlined above (the "Colon factors") survive Iqbal, Raspardo v. Carlone, 770 F.3d 97, 117 (2d Cir. 2014), citing Reynolds v. Barrett, 685 F.3d 193, 205-06 n.14 (2d Cir. 2012), it appears that they do, as demonstrated by the recent Second Circuit opinions cited above that continue to cite the Colon factors.

pain" proscribed by the Eighth Amendment.'" Washington v. City of New York, 10 Civ. 389 (LTS)(JLC), 2011 WL 566801 at *2 (S.D.N.Y. Feb. 15, 2011) (Swain, D.J.), quoting Estelle v. Gamble, supra, 429 U.S. at 104 (alteration in original; footnote omitted).

Not every claim of inadequate medical treatment by a prisoner rises to the level of a constitutional violation. Estelle v. Gamble, supra, 429 U.S. at 105. The failure to provide medical care to a prisoner will give rise to a constitutional violation only if two elements are established:

> The first requirement is objective: "the alleged deprivation of adequate medical care must be 'sufficiently serious.'" Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (quoting Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L.E.2d 811 (1994)). The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care. Id. at 280. This means "that the charged official [must] act or fail to act while actually aware of a substantial risk that serious inmate harm will result." Id. (emphasis added). Officials need only be aware of the risk of harm, not intend harm. Id. And awareness may be proven "from the very fact that the risk was obvious." Farmer, 511 U.S. at 842, 114 S. Ct. 1970.

Spavone v. New York State Dep't of Corr. Servs., 719 F.3d 127, 138 (2d Cir. 2013) (brackets in original); accord Benitez v. Parmer, 654 F. App'x 502, 504 (2d Cir. 2016) (summary order); Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005). A plaintiff must establish both the objective and subjective prongs of the

deliberate indifference standard in order to prevail. See Hill
v. Curcione, supra, 657 F.3d at 122.

A medical need is sufficiently serious if it is "a
condition of urgency, one that may produce death, degeneration,
or extreme pain." Johnson v. Wright, supra, 412 F.3d at 403
(internal quotation marks omitted). Factors considered in
determining the existence of a serious medical condition include

> "[t]he existence of an injury that a reasonable doctor
> or patient would find important and worthy of comment
> or treatment; the presence of a medical condition that
> significantly affects an individual's daily activities;
> []the existence of chronic and substantial pain,"
> Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998),
> or "the absence of adverse medical effects or demon-
> strable physical injury." Carpenter, 316 F.3d at 187.

Edmonds v. Central N.Y. Psychiatric Ctr., 10 Civ. 5810 (DAB)(KNF-
), 2011 WL 3809913 at *4 (S.D.N.Y. Aug. 25, 2011) (Batts, D.J.)
(alterations in original; footnote omitted). "The inquiry [with
respect to the objective element of a deliberate indifference
claim] is 'fact-specific' and 'must be tailored to the specific
circumstances of each case.'" Thomas v. Westchester County, 12
Civ. 6718 (CS), 2013 WL 3357171 at *4 (S.D.N.Y. July 3, 2013)
(Seibel, D.J.), quoting Smith v. Carpenter, 316 F.3d 178, 185 (2d
Cir. 2003); see also Hudson v. McMillian, 503 U.S. 1, 8 (1992)
("The objective component of [a deliberate indifference] claim
is . . . contextual" and fact-specific).

21

Where the plaintiff claims that a medical diagnosis

and/or treatment has been improperly delayed, the inquiry with

respect to the objective element focuses on the sequelae of the

delay rather than the underlying condition itself.

> [W]here, as here, a prisoner alleges "a temporary delay
> or interruption in the provision of otherwise adequate
> medical treatment, it is appropriate to focus on the
> challenged delay or interruption in treatment rather
> than the prisoner's underlying medical condition alone
> in analyzing whether the alleged deprivation is, in
> 'objective terms, sufficiently serious,' to support an
> Eighth Amendment claim." Smith v. Carpenter, 316 F.3d
> 178, 185 (2d Cir. 2003) (quoting Chance v. Armstrong,
> 143 F.3d 698, 702 (2d Cir. 1998)) (emphases in origi-
> nal).

Bilal v. White, 494 F. App'x 143, 145 (2d Cir. 2012) (summary

order). "Stated differently, 'it's the particular risk of harm

faced by the prisoner due to the challenged deprivation of care,

rather than the severity of the prisoner's underlying medical

condition, considered in the abstract, that is relevant for

Eighth Amendment purposes.'" Goris v. Breslin, 402 F. App'x 582,

585 (2d Cir. 2010) (summary order), quoting Smith v. Carpenter,

supra, 316 F.3d at 186.

The subjective prong of a Section 1983 claim for

inadequate medical care requires the plaintiff to prove that "the

charged official [acted] with a sufficiently culpable state of

mind." Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).  A

plaintiff must show that "the prison official was aware of, and

consciously disregarded, the prisoner's medical condition."
Hernandez v. Goord, 02 Civ. 1704 (DAB), 2006 WL 2109432 at *6
(S.D.N.Y. July 28, 2006) (Batts, D.J.), citing Chance v. Armstro-
ng, supra, 143 F.3d at 703. "'Deliberate indifference is a
mental state equivalent to subjective recklessness . . . . This
mental state requires that the charged official act or fail to
act while actually aware of a substantial risk that serious
inmate harm will result.'" Nielsen v. Rabin, 746 F.3d 58, 63 (2d
Cir. 2014) (alteration in original; footnote omitted), quoting
Salahuddin v. Goord, supra, 467 F.3d at 280; Hemmings v. Gorczyk,
134 F.3d 104, 108 (2d Cir. 1998) (per curiam) (standard is
"equivalent to criminal recklessness, [where] the official knows
of and disregards an excessive risk to inmate health or safety"
(internal quotation marks omitted)). "The reckless official need
not desire to cause such harm or be aware that such harm will
surely or almost certainly result. Rather, proof of awareness of
a substantial risk of the harm suffices." Salahuddin v. Goord,
supra, 467 F.3d at 280, citing Farmer v. Brennan, supra, 511 U.S.
at 835, 842.

A constitutional violation requires "more than ordinary
lack of due care for the prisoner's interests or safety."
Whitley v. Albers, 475 U.S. 312, 319 (1986). An Eighth Amendment
claim does not lie for conduct that is merely negligent. Estelle

23

v. Gamble, supra, 429 U.S. at 106 ("[A] complaint that a physi-
cian has been negligent in diagnosing or treating a medical
condition does not state a valid claim of medical mistreatment
under the Eighth Amendment."); Matican v. City of New York, 524
F.3d 151, 158 (2d Cir. 2008); Hendricks v. Coughlin, 942 F.2d
109, 113 (2d Cir. 1991); Hudak v. Miller, 28 F. Supp. 2d 827, 831
(S.D.N.Y. 1998) (Sotomayor, then D.J, now J.).  In addition,
"[i]t is well-established that mere disagreement over the proper
treatment does not create a constitutional claim.  So long as the
treatment given is adequate, the fact that a prisoner might
prefer a different treatment does not give rise to an Eighth
Amendment violation."  Chance v. Armstrong, supra, 143 F.3d at
703; accord Thompson v. Racette, 519 F. App'x 32, 34 (2d Cir.
2013) (summary order).

   B.  Application of
       the Foregoing Principles

          Defendants do not address the threshold question of
whether Drs. Koenigsmann, Whalen and Makram were acting under
color of state law.  In any event, "[p]ublic employees acting in
their official capacity or exercising their responsibilities
pursuant to state law generally are considered to be acting under
color of state law."  Day v. Warren, No. 3:06CV155 (AWT), 2006 WL

24

3259117 at *2 (D. Conn. Nov. 8, 2006); accord Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004). Thus, I shall proceed to address the substance of plaintiff's deliberate indifference claim.

### 1. Drs. Koenigsmann and Whalen

As noted above, see Section III.A.2, supra, the personal involvement of a defendant in an alleged constitutional violation is necessary for Section 1983 liability. Plaintiff has not offered evidence sufficient to give rise to a genuine issue of fact that either Dr. Koenigsmann or Dr. Whalen was personally involved in the events at issue.

Plaintiff has failed to offer any evidence that Dr. Koenigsmann directly participated in requesting the MRI, delaying it or approving it. To the contrary, defendants have presented evidence that as Chief Medical Officer, Dr. Koenigsmann would not have ordinarily been involved in the approval of an MRI request resulting from an injury (Makram Decl. ¶ 15). Plaintiff has also failed to present any evidence of any policy or custom created by Dr. Koenigsmann which resulted in delays conducting MRIs.[11]

---

[11]There is no evidence that Dr. Koenigsmann either created or approved the utilization review process.

Plaintiff has failed to offer evidence that Dr. Koenigsmann was personally involved in any other manner that would be sufficient to sustain a finding of liability[12]; in fact, plaintiff testified that he first wrote to Dr. Koenigsmann in January 2011 (Schulman Decl., Ex. D, at 38:15-38:18), which suggests that he did not even know about any delay in getting an MRI until after plaintiff's appointment with Dr. Holder.[13] In the absence of some evidence that Dr. Koenigsmann was personally involved in the events at issue, he cannot be liable on plaintiff's claim.

There is also no evidence that Dr. Whalen directly participated in approving the MRI. As Regional Medical Director, Dr. Whalen would not have been involved in the utilization review process until APS preliminarily denied the request for an MRI (Schulman Decl., Ex. H ¶ III.A.4; Makram Decl. ¶ 15). Here, however, the request for an MRI was never preliminarily denied;

---

[12]For example, while plaintiff's claim that Dr. Koenigsmann failed to train and supervise Dr. Whalen was not dismissed (Opinion and Order, at 53), the claim cannot survive summary judgment because there is no evidence that Dr. Whalen committed any constitutional violation, nor is there evidence that Dr. Koenigsmann failed to train and supervise Dr. Whalen (see Schulman Decl., Ex. D, at 65:14-65:18 (plaintiff testified that he had no personal knowledge whether Dr. Koenigsmann failed to train or supervise DOCCS medical staff)).

[13]Plaintiff testified that Dr. Koenigsmann should be liable because he was Dr. Makram's boss (Schulman Decl., Ex. D, at 64:21-65:4). However, as explained above, see Section III.A.2, supra, a supervisor cannot be held liable under Section 1983 solely on a theory of respondeat superior.

rather, it was deferred pending receipt of more information
(Makram Decl. ¶ 15). Plaintiff has failed to present evidence
that Dr. Whalen was personally involved in any other way that
would be sufficient to sustain a finding of liability[14]; plain-
tiff has not even presented evidence of when Dr. Whalen learned
about the events at issue.

Because plaintiff has failed to create a genuine issue
of material fact whether Dr. Koenigsmann or Dr. Whalen was
personally involved in requesting, delaying or approving the MRI,
they are entitled to summary judgment on plaintiff's deliberate
indifference claim.

### 2. Dr. Makram

Unlike Drs. Koenigsmann or Whalen, there is evidence
that Dr. Makram was personally involved in procuring plaintiff's
MRI. However, as explained below, because plaintiff has failed
to create a genuine issue of material fact with respect to both
the objective and subjective prongs of his deliberate indiffer-
ence claim, Dr. Makram is also entitled to summary judgment.

---

[14]For example, as with Dr. Koenigsmann, there is no evidence
that Dr. Whalen either created or approved the utilization review
process.

27

a.  <u>Serious Medical Need</u>

Plaintiff has not offered evidence sufficient to give rise to a genuine issue of fact concerning whether his medical needs were sufficiently serious to satisfy the objective prong of his deliberate indifference claim.

The majority of the factors weighed in assessing whether there was a serious injury, <u>see</u> Section III.A.2.a, <u>supra</u>, favor defendants.  First, plaintiff himself did not complain about the delay in getting his MRI.  Plaintiff testified that he had no proof that he asked anyone at DOCCS between October 25 and the date of the MRI about the delay in scheduling his MRI (Schulman Decl., Ex. D, at 37:10-37:13).

Second, plaintiff's daily activities were not significantly limited by any delay in treatment.  Plaintiff utilized his sling for only one week, even though he was supposed to wear it until the MRI report was completed (Schulman Decl., Ex. D, at 55:12-55:14; Makram Decl., Ex. A, at MED136).  Although Dr. Lancellotti noted on October 21, 2010 that plaintiff had "decreased motor ability to flex @ elbow" and "weakness of muscle[]distal [<u>sic</u>] to shoulder" (Makram Decl. ¶ 13 & Ex. B, at MED1822), on December 9, 2010 Dr. Holder noted that plaintiff had a full range of motion with no restrictions and no weakness on

abduction or flexing (Makram Decl., Ex. B, at MED090). Although plaintiff was restricted from physical activities, plaintiff requested that those medical restrictions be lifted and that he be allowed to return to work on December 31, 2010 (Schulman Decl., Ex. D, at 56:23-57:6), and he was cleared to return for "full duty" work (Schulman Decl., Ex. D, at 57:19-58:12).[15] He also ultimately resumed lifting weights because his pain had ceased and he had a full range of motion (Schulman Decl., Ex. D, at 59:2-59:9). Thus, any restrictions on plaintiff's activities were temporary and resolved without medical intervention.

Third, there is no evidence of chronic and substantial pain. Although plaintiff claims that he has constant, worsening pain (Letter from Frank A. DeMeo to the undersigned, dated Dec. 28, 2016, at 1), "subjective complaints of pain are not sufficient to satisfy [the serious medical need] standard." Martinez v. Aycock-West, 164 F. Supp. 3d 502, 512 (S.D.N.Y. 2016) (Karas, D.J.) (alteration in original; internal quotation marks omitted); accord Butler v. Zamilus, 14 Civ. 853 (KMK), 2016 WL 5720794 at *8 (S.D.N.Y. Sept. 30, 2016) (Karas, D.J.). There is no other

---

[15]Although plaintiff testified that he did not "really perform any weight room activities or porter work," that was because "there's other porters there[] [a]nd [his] boss at that time, he gave [plaintiff] a lot of leeway" (Schulman Decl., Ex. D, at 58:13-58:22); there is no evidence that plaintiff did not perform his duties due to a medical condition.

evidence supporting plaintiff's claim of pain. No doctor noted
that plaintiff was experiencing pain. Additionally, plaintiff
admitted that he did not take any medication for his injuries
(except after his surgery) (Schulman Decl., Ex. D, at 71:16-
71:25) and that any temporary pain he had subsided (Schulman
Decl., Ex. D, at 59:4-59:9).

Fourth, there was a demonstrable physical injury to
plaintiff's biceps. The nurse noted a deformity on plaintiff's
biceps, both she and Switz noted a bruise on plaintiff's biceps
(Makram Decl., Ex. A, at MED136) and Dr. Lancellotti noted a
large hematoma on plaintiff's upper arm (Makram Decl. ¶ 13 & Ex.
B, at MED1822).[16]

Nonetheless, because the majority of the factors favor
defendants, I conclude that there is no genuine issue that
plaintiff did not experience a serious injury.

Even if there were a serious injury, plaintiff cannot
establish that any delay attributable to Dr. Makram caused a
worsening of his condition. "Courts have found that a plain-
tiff's allegations fail to meet the objective prong where the

---

[16]It is not clear whether there was a demonstrable physical
injury to plaintiff's rotator cuff. Although Dr. Lancellotti
noted that there was "weakness of muscle[]distal [sic] to shoul-
der" (Makram Decl. ¶ 13 & Ex. B, at MED1822), it is unclear
whether Dr. Lancellotti was referring to plaintiff's biceps or
his rotator cuff.

alleged delay in providing medical attention is neither the underlying cause of a plaintiff's condition nor contributed to a worsening in the condition[.]" Cuffee v. City of New York, 15 Civ. 8916 (PGG)(DF), 2017 WL 1232737 at *9 (S.D.N.Y. Mar. 3, 2017) (Freeman, M.J.) (Report & Recommendation) (internal quotation marks omitted), adopted at, 2017 WL 1134768 (S.D.N.Y. Mar. 27, 2017) (Gardephe, D.J.); accord Valdiviezo v. City of New York, 15 Civ. 3902 (AJN), 2017 WL 1191528 at *5 (S.D.N.Y. Mar. 29, 2017) (Nathan, D.J.), appeal filed, No. 17-1093 (2d Cir. 2017). With regard to the biceps injury, Dr. Holder noted that the injury was "chronic" (Makram Decl., Ex. B, at MED090). According to Dr. Makram, that meant that plaintiff had the injury for a long time, but that his symptoms were aggravated on October 13, 2010 (Makram Decl. ¶ 22). The chronic nature of plaintiff's condition was confirmed by the MRI, which showed no evidence of muscle atrophy, and by Dr. Holder's findings that plaintiff had a full range of motion in the biceps and no muscle weakness (Makram Decl. ¶ 22). Dr. Holder's diagnosis that plaintiff's injury was chronic indicated to Dr. Makram that the delay in getting an MRI was not a factor in determining whether plaintiff was amenable to surgery (Makram Decl. ¶ 27), and there is no evidence that a delay otherwise contributed to a worsening of the condition. Nor did any delay exacerbate the rotator cuff injury, given that Dr.

Holder concluded that there was no clinical rotator cuff tear and did not recommend orthopedic intervention (Makram Decl., Ex. B, at MED090).

Accordingly, there is no genuine issue of material fact as to whether plaintiff's medical needs were sufficiently serious to satisfy the objective prong of his deliberate indifference claim.

### b. Culpable State of Mind

As explained above, in order to succeed on his deliber-ate indifference claim, plaintiff also needs to prove that Dr. Makram "act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm w[ould] result." Salahuddin v. Goord, supra, 467 F.3d at 280 (emphasis added), citing Farmer v. Brennan, supra, 511 U.S. at 836-37; accord Youmans v. City of New York, 14 F. Supp. 3d 357, 364 (S.D.N.Y. 2014) (Karas, D.J.). However, there is no genuine issue of fact as to whether Dr. Makram acted with a culpable state of mind.

Before the request for an MRI, Dr. Makram's only involvement with plaintiff's medical care was reviewing his x-ray (Makram Decl. ¶¶ 8, 27). By that time, the request for an MRI had already been approved (Makram Decl. ¶¶ 8, 13). Dr. Makram

32

had no role in the utilization review process; she never disap-
proved the MRI, and she was not involved in the request for more
information (Makram Decl. ¶ 17).[17] Rather, Dr. Makram became
involved in obtaining the MRI when she spent several days calling
radiologists to find one willing to perform the procedure at a
location suitable for a medium security inmate, a matter that was
complicated due to the metal screws in plaintiff's shoulders
(Makram Decl. ¶ 16). Far from being deliberately indifferent to
plaintiff's medical needs, Dr. Makram was trying to expedite
plaintiff's MRI.

Nor did Dr. Makram play a role in delaying a referral
to Dr. Holder. Dr. Makram reviewed plaintiff's MRI on December
1, 2010, two days after it arrived at the facility (Makram Decl.
¶ 18).[18] That same day, Dr. Makram referred the report to Dr.
Lancellotti, who was plaintiff's treating physician (Makram Decl.
¶ 18).

_____

[17]Plaintiff testified that he believed Dr. Makram denied the
request for an MRI based on financial considerations (Schulman
Decl., Ex. D, at 38:19-39:17). This belief was based on a
conversation with Dr. Lancellotti and a past experience (Schulman
Decl., Ex. D, at 38:19-39:17). However, any remarks by Dr.
Lancellotti are hearsay as to Dr. Makram and inadmissible, and
any belief that Dr. Makram denied his MRI because of financial
considerations, based on a past experience, is pure speculation.

[18]There is no evidence that Dr. Makram was aware of a delay
between the MRI on November 15, 2010 and the receipt of the MRI
results by Woodbourne on November 29, 2010.

Finally, before reviewing Dr. Holder's evaluation, Dr. Makram was not aware of any circumstances suggesting that plaintiff had sustained any injury requiring surgery on an expedited basis (Makram Decl. ¶ 27). This, too, cannot establish subjective recklessness. See Spavone v. New York State Dep't of Corr. Servs., supra, 719 F.3d at 138 (subjective recklessness "means that the charged official [must] act or fail to act while actually aware of a substantial risk that serious inmate harm will result" (alteration and emphasis in original; internal quotation marks omitted)).

### 3. Summary

Plaintiff has failed to offer evidence sufficient to give rise to a genuine issue of material fact with respect to his deliberate indifference claim. First, he has failed to offer evidence sufficient to support a finding that Drs. Koenigsmann and Whalen were personally involved in requesting, delaying or approving the MRI. Second, plaintiff has failed to offer evidence sufficient to support a finding that his medical needs were sufficiently serious and, therefore, plaintiff cannot satisfy the objective prong of his claim. Third, he has failed to offer evidence sufficient to support a finding that Dr. Makram acted

with a culpable state of mind and, thus, plaintiff cannot satisfy the subjective prong of his claim, either.[19]

IV.  Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted and the complaint is dismissed.[20] The Clerk of the Court is respectfully requested to mark this matter closed.

Dated:    New York, New York
          July 7, 2017

                              SO ORDERED

                              HENRY PITMAN
                              United States Magistrate Judge

Copies sent to:

---

[19]Because summary judgment has been granted with respect to plaintiff's deliberate indifference claim, I need not address defendants' argument that they are entitled to qualified immunity.  See, e.g., Robles v. Khahaifa, No. 09CV718, 2012 WL 2401574 at *9 (W.D.N.Y. June 25, 2012) ("Given that no constitutional violation was found, this Court need not address defendants' alternative contention that they deserve qualified immunity for their actions.").

[20]Plaintiff had requested the appointment of counsel in a non-docketed application.  In light of the dismissal, the application is denied as moot.  The application will be docketed contemporaneously with the docketing of this Opinion and Order.

35

Mr. Frank A. DeMeo
233 Pleasant Street
Ronkonkoma, New York   11779

Steven N. Schulman, Esq.
Assistant Attorney General
State of New York
120 Broadway
New York, New York   10271-0332